## UNITED STATES *v.* UNION PACIFIC RAILWAY COMPANY AND WESTERN UNION TELEGRAPH COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 334.   Argued October 18, 19, 1894. — Decided November 18, 1895.

The objects which Congress sought to accomplish by the act of July 1, 1862, c. 120, 12 Stat. 489, granting a subsidy to aid in the construction of both a railroad and a telegraph line from the Missouri River to the Pacific Ocean, and by the act of July 2, 1864, c. 216, 13 Stat. 356, amendatory thereof, were the construction, the maintenance and the operation of both a railroad and a telegraph line between those two points; the governmental aid was extended for the purpose of accomplishing all these important results; and there is nothing in subsequent legislation to indicate a change of this purpose.

The provisions in those acts permitting the railroad company to arrange with certain telegraph companies for placing their lines upon and along the route of the railroad, and its branches, did not affect the authority of Congress, under its reserved power, to require the maintenance and operation by the railroad company itself, through its own officers and employés, of a telegraph line over and along its main line and branches.

VOL. CLX—1

An arrangement between the railroad company and the telegraph company, such as was permitted by the 19th section of the act of July 1, 1862, and by the fourth section ·of the act of July 2, 1864, c. 220, known as the Idaho Act, could have no other effect than to relieve the railroad company from any present duty itself to construct a telegraph line to be used under the franchises granted and for the purposes indicated by Congress: No arrangement of the character indicated by Congress could have been made except in view of the possibility of the exercise by Congress of the power reserved to add to, or amend the act ·that permitted such arrangement.

It was not competent for Congress under its reserved power to add to, alter, or amend these acts to impose upon the railroad company duties wholly foreign to the objects for which it was created or for which governmental aid was given, nor, by any alteration or amendment of those acts, destroy rights actually vested, nor disturb transactions fully consummated. With the policy of such legislation the courts have nothing to do.

The provision in the act of August 7, 1888, c. 772, 25 Stat. 382, requiring all railroad and telegraph companies to which the United States have granted subsidies, to "forthwith and henceforward, by and through their own respective corporate officers and employés, maintain and operate, for railroad, governmental, commercial and all other purposes, telegraph lines, and exercise by themselves alone all the telegraph franchises conferred upon them and obligations assumed by them under the acts making the grants," is a valid exercise of the power reserved by Congress.

Since the passage of the act of July 24, 1866, c. 230, the provisions of which were embodied in the Revised Statutes Title LXV, Telegraphs, no railroad company operating a post-road of the United States, over which interstate commerce is carried on, can bind itself, by agreement, to exclude from its roadway any telegraph company, incorporated under the laws of a State, that has accepted the provisions of that act, and desires to use such roadway for its line in such manner as will not interfere with the ordinary travel thereon.

The agreement of October 1, 1866, between the Union Pacific Railway Company, Eastern Division, and the Western Union Telegraph Company gave the telegraph company the absolute control of all telegraphic business on the routes of the railway company, and consequently tended to make the act of July 24, 1866, c. 230, 14 Stat. 221, ineffectual and was hostile to the object contemplated by Congress; and, being thus in its essential provisions invalid, it was not binding upon the railway company.

The agreements of September. 1, 1869, and December 14, 1871, between the Union Pacific Railroad Company and the Atlantic and Pacific Telegraph Company were void.

The agreement of July 1, 1887, between the Union Pacific Railway Company and the Western Union Telegraph Company is illegal, not only to the extent it assumes to give to the telegraph company exclusive rights and advantages in respect of the use of the way of the railroad company for

telegraph purposes, but also because, in effect, it transfers to the telegraph company the telegraphic franchise granted it by the United States, which was not permitted by the acts of Congress defining the obligations of railroad companies that had accepted the bounty of the government.

While the United States might proceed by mandamus against the railway company to compel it to perform the duties imposed by its charter, it has the further right, in this suit, to ask the interposition of a court of equity to compel a cancellation of the agreements under which the telegraph company asserts rights inconsistent with the several acts of Congress, and the final decree in such a suit may require the railway company to obey the directions of Congress as given in those acts.

This suit was commenced by the United States in the Circuit Court for the District of Nebraska. A decree was there made giving the plaintiff the relief it asked for. 50 Fed. Rep. 28. An appeal was taken to the Circuit Court of Appeals for the Eighth Circuit, where the decree of the Circuit Court was reversed. 19 U. S. App. 531. From that decree the United States took this appeal. The case is stated in the opinion of the court.

*Mr. Solicitor General Maxwell* for appellant.

*Mr. Rush Taggart* for the Western Union Telegraph Company, appellee.

*Mr. John F. Dillon,* for the Union Pacific Railway Company, appellee. *Mr. John M. Thurston* and *Mr. Jeremiah M. Wilson* were on his brief.

Mr. Justice Harlan delivered the opinion of the court.

This suit was brought by the United States against the Union Pacific Railway Company and the Western Union Telegraph Company under the authority of the act of Congress of August 7, 1888, c. 772, 25 Stat. 382, supplementary to the act commonly known as the Pacific Railroad act of July 1, 1862, c. 120, 12 Stat. 489, and to the act of July 2, 1864, c. 216, 13 Stat. 356, and other acts amendatory of the act of 1862.

By the first section of the above act of 1888, it is provided that all railroad and telegraph companies to which the United States have granted any subsidy in lands or bonds or loan of

credit for the construction of either railroad or telegraph lines, and which, by the acts incorporating them, or by any amendatory or supplementary act, were required to construct, maintain, or operate telegraph lines, and all companies engaged in operating such railroad or telegraph lines "shall forthwith and henceforward, by and through their own respective corporate officers and employés, maintain, and operate, for railroad, governmental, commercial, and all other purposes, telegraph lines, and exercise by themselves alone all the telegraph franchises conferred upon them and obligations assumed by them under the acts making the grants as aforesaid."

The second section declares that any telegraph company, having accepted the provisions of Title LXV, Telegraphs, of the Revised Statutes, which should extend its line to any station or office of a telegraph line belonging to any one of the railroad or telegraph companies referred to in the first section, shall have the right and shall be allowed "to connect with the telegraph line of said railroad or telegraph company to which it is extended at the place where their lines may meet, for the prompt and convenient interchange of telegraph business between said companies; and such railroad and telegraph companies, referred to in the first section of this act, shall so operate their respective telegraph lines as to afford equal facilities to all, without discrimination in favor of or against any person, company, or corporation whatever, and shall receive, deliver, and exchange business with connecting telegraph lines on equal terms, and affording equal facilities, and without discrimination for or against any one of such connecting lines; and such exchange of business shall be on terms just and equitable."

If any railroad or telegraph company referred to in the first section, or any company operating such railroad or telegraph line, refuses or fails, in whole or in part, to maintain and operate a telegraph line as provided in the act of 1888 and the acts to which it is supplementary, "for the use of the Government or the public, for commercial and other purposes, without discrimination," or refuses or fails to make or continue such arrangements for the interchange of business with any connecting telegraph company, then, by the third section, application for

relief may be made to the Interstate Commerce Commission, whose duty it shall be to ascertain the facts, and prescribe such arrangement as will be proper in the particular case.

The fourth section is in these words: "In order to secure and preserve to the United States the full value and benefit of its liens upon all the telegraph lines required to be constructed by and lawfully belonging to said railroad and telegraph companies referred to in the first section of this act, and to have the same possessed, used, and operated in conformity with the provisions of this act and of the several acts to which this act is supplementary, it is hereby made the duty of the Attorney General of the United States, by proper proceedings, to prevent any unlawful interference with the rights and equities of the United States under this act, and under the acts hereinbefore mentioned, and under all acts of Congress relating to such railroads and telegraph lines, and to have legally ascertained and finally adjudicated all alleged rights of all persons and corporations whatever claiming in any manner any control or interest of any kind in any telegraph lines or property, or exclusive rights of way upon the lands of said railroad companies, or any of them, and to have all contracts and provisions of contracts set aside and annulled which have been unlawfully and beyond their powers entered into by said railroad or telegraph companies, or any of them, with any other person, company, or corporation."

The fifth section subjects to fine and imprisonment any officer or agent of a company operating its railroads and telegraph lines who refuses or fails, in such operation and use, to afford and secure equal facilities to the government and the public, or to secure to each of said connecting telegraph lines equal advantages and facilities in the interchange of business, as provided for, without any discrimination whatever for or adverse to the telegraph line of any or either of said connecting companies, or refuses to abide by or perform and carry out within a reasonable time the order or orders of the Interstate Commerce Commission. The party aggrieved may also sue the company, whose officer or agent violates the provisions of the act, for any damages thereby sustained.

. .The sixth section makes it the duty of all railroads and telegraph companies to report to the Interstate Commerce Commission in relation to certain matters, and to file with that body copies of all contracts and agreements of every description between it and every other person or corporation in reference to the ownership, possession, maintenance, control, use, or operation of any telegraph lines or property over or upon its rights of way.

The defendant, the Union Pacific Railway Company, is a corporation formed by the consolidation (under the authority of the above acts of Congress of July 1, 1862, c. 120, 12 Stat. 489, and July 2, 1864, 13 Stat. c. 216, 356) of the following companies: The Union Pacific Railroad Company, incorporated by the act of July 1, 1862; the Kansas Pacific Railway Company, formerly known as the Union Pacific Railway Company, Eastern Division, which latter company succeeded to the rights and powers of the Leavenworth, Pawnee and Western Railroad Company, a Kansas corporation that accepted the aid provided by the act of July 1, 1862; and the Denver Pacific Railway and Telegraph Company, a corporation of Colorado.

The present suit proceeds on the ground that the Union Pacific Railway Company is conducting its business under certain contracts and agreements with the Western Union Telegraph Company that are not only repugnant to the provisions of the above act of 1888, but are inconsistent with the rights of the United States, and in violation of the obligations imposed upon the railway company by other acts of Congress. The relief asked was a decree annulling those contracts and agreements and compelling the railway company to maintain and operate telegraph lines on its roadways, as required by the act of 1888.

By the final decree of the Circuit Court it was adjudged, among other things, that the following agreements be annulled and held for naught:

An agreement of October 1, 1866, between the Union Pacific Railway Company, Eastern Division, and the Western Union Telegraph Company;

Two agreements, one of September 1, 1869, and one of

December 14, 1871, between the Union Pacific Railroad Company and the Atlantic and Pacific Telegraph Company, the rights of the latter company having been acquired, as is claimed, by the Western Union Telegraph Company ; and,

An agreement of July 1, 1881, between the Union Pacific Railway Company and the Western Union Telegraph Company. 50 Fed. Rep. 28.

It will be well, at this point, to refer to the principal parts of the several agreements that were set aside and annulled by the final decree of the Circuit Court.

By the agreement of October 1, 1866, between the Union Pacific Railway. Company, Eastern Division, and the Western Union Telegraph Company, the railway company agreed to pay to the telegraph company the cost of the telegraph poles that had been erected by the latter company along the railroad between Wyandotte and Fort Riley, except for such as. have been already furnished and erected by said railway company, and also the cost of the wire and insulators for a telegraph line with one wire, between those points, except for such distance as the railroad company had already provided wires and insulators ; to furnish and distribute along their road west of Fort Riley, as fast as the same was completed, suitable poles for a first-class telegraph line, and wires and insulators for a telegraph line with one wire ; to supply and distribute suitable telegraph poles, as required from time to time ; to repair and renew the line as might be necessary ; to transport, free of charge, for the telegraph company all persons engaged in and material required for the construction, reconstruction, working, repairing, and maintaining said telegraph line ; and to furnish a suitable telegraph office in the depot at Wyandotte, Kansas, free of charge, and pay one-half of the salary of the operator in such office, or so much thereof as was necessary to save the telegraph company from loss at that office — such operator to be fully qualified to do the business of the railway company, and to be appointed and his salary fixed by the parties to the contract.

The railway company further stipulated " not to transport any persons engaged in or property intended for the construction or repair of any other line of telegraph along their railway,

except at the usual and regular rates charged by said railway company for passengers and freight, nor give permission to nor make any agreement with any other telegraph company to construct or operate any telegraph line upon the lands or roadway of said railway company, without the consent in writing of the telegraph company. The above agreed to by said railway company so far as it has the right to do so."

The telegraph company agreed, upon its part, that it would erect poles, attach the insulators, and string the wire to be furnished or paid for by the railway company, as provided, as fast as each section of twenty miles of railroad was completed; that the first wire should belong to the railway company, and be for their use exclusively after the second wire was put up, "but no commercial or paid business shall be transmitted by the railway company from any station where the telegraph company shall have an office, without the consent of the latter;" that if the business of the railway company should, in its opinion, require more than one wire, they might appropriate another wire, upon paying to the telegraph company the cost of such wire on the poles, the telegraph company to attach such other wire for the use of the company; that the business of the railway company of every kind, and the family, private, and social messages of its executive officers, should be transmitted without charge between all telegraph stations on the line of said roadway, and between all such stations and St. Louis, and over all other lines in Missouri, Kansas, Colorado, and New Mexico, then owned or controlled, or which might thereafter be owned or controlled, by the telegraph company, provided, so far as said lines in Colorado and New Mexico were concerned, and the road or roads of the Union Pacific Railway Company, Eastern Division, were at the time in process of construction towards Santa Fé or Denver, or both, all such business should be transmitted free of charge over all other lines then or thereafter to be owned or controlled by the telegraph company within the United States, to an amount not exceeding four thousand dollars per annum, with a rebate of one-half of regular tariff charges for all in excess of that amount; that until a second wire was put up,

both parties could use the first wire, the business of the railway company having preference; and if either wire was interrupted or required by the United States, both parties might use the other one as far as practicable, but without delay or charge to the railway company; that the telegraph company should furnish all main batteries required for the efficient working of the telegraph line provided for, and keep the line in good working order, without expense to the railway company, except for the materials which the latter had agreed to supply.

Again: That "the railway company may establish, at their own expense, as many offices as they require, and at all places where the telegraph company has no separate office the employés of the railway company shall, so long as it may not interfere with the business of said railway company, receive, transmit, and deliver such commercial or paid business as may be offered at the tariff rates of the telegraph company, provided such paid business does not amount to enough to pay the expenses of a separate telegraph office, and shall account for and pay over to the latter, monthly, the amount thereof at such rates; and concerning such business, all rules, regulations, and orders of the telegraph company applicable thereto shall be observed; but said railway company shall not be amenable in any way to said telegraph company for the acts or operations of said agents, otherwise than to remedy the difficulty in future;" that each party, at its own expense, should have the right to add as many lines as its business required; that it would perform without charge for the railway company what should be decided by competent authority to be its telegraphic obligations to the Government of the United States; and that a telegraph line should be constructed on the road of the railway company from Leavenworth to Lawrence at such time, between May 31, 1867, and September 1, 1868, as that company might decide, and upon the same terms and conditions as that west of Fort Riley.

By the agreement of September 1, 1869, between the Atlantic and Pacific Telegraph Company and the Union Pacific Railroad Company, the railroad company, in consideration of thirty-three thousand shares of the stock of the telegraph

company, (for an increase of whose stock the agreement made provision,) demised and leased to that telegraph company "all its telegraph line, wires, poles, instruments, offices, and other property by it possessed appertaining to the business of telegraphing for the purpose of sending messages and doing a general telegraphic business," to have and to hold during the whole term of the charter of the telegraph company, and any renewals thereof, subject to the rights of the United States, as set forth in the charter of the railroad company, and on condition that the telegraph company should fully perform all duties that were or might be imposed upon the railroad company by its charter or by the laws of the United States.

It was further stipulated in that agreement that the telegraph company should proceed at once, as soon as arrangements were perfected for extending its line to San Francisco, to put two additional wires, fully equipped and furnished, on the poles demised along the whole length of its line; the railroad company to maintain and keep in repair such poles, wires, and equipments at its expense during the period of such demise, until from age or other cause they were required to be renewed, in which case the telegraph company should meet the cost of renewal; that the railroad company should at its own expense employ, during a period of twenty-five years, suitable persons to operate said telegraph at its own stations, other than at Omaha and such other stations as required, for the business of both parties, operators in addition to those needed by the railroad company; that the railroad company should have the right free of expense to the constant and perpetual use of two of the wires when required for its business, and the free use for its business of the whole line of telegraph, which should then or thereafter belong to or be controlled or operated by the telegraph company, to and from all parts of the United States, for all purposes connected with the management of the road or its business; that the telegraph company should have such preferential privileges and facilities for its business as are usually granted by railroad companies in contracts of connection with telegraph companies; and that the railroad company should "afford all other telegraph com-

panies only such facilities as by law·they now are or may hereafter be required to afford as common carriers or otherwise, in which shall not be included the privilege of using hand cars or of stopping trains except at regular stations, or transporting the officers or servants of such companies, except on regular passenger trains at regular rates of fare, or of transporting material for such companies or persons (other than the parties of the first part) except on regular freight trains and at the usual rates of freight, unless the facilities aforesaid, or some of them, shall be required by law to be afforded such companies or persons."

These companies entered into a supplementary agreement on the 14th day of December, 1871, by which the original contract was modified in certain particulars, that need not be set out, and which provided that for all the purposes of both the original and supplementary contract the road of the railroad company "demised by said original contract shall be deemed and taken to terminate at the junction of the Union Pacific Railroad Company with the Central Pacific Railroad Company, as now established, which junction is at a point about five miles west of Ogden, and all the rights of the parties under said contract and supplement shall be made to conform to this modification."

The agreement between the Western Union Telegraph Company and the Union Pacific Railway Company of July 1, 1881, recites that the former corporation had acquired all the property, rights, and franchises of the Atlantic and Pacific Telegraph Company, and was in possession of and operating a separate line of poles and wires along the main line of the Union Pacific Railway Company between Omaha and Ogden; that the parties were then, and for some time past had been, operating lines of telegraph along various roads of the railway company, under sundry contracts, thirteen in number, including the above agreements of 1866, 1869, and 1871, and made between the railway company or companies·formerly in possession of lines of railroad, then controlled by and forming part of that company, and the Western Union Telegraph Company, or other telegraph companies that had become

merged into the latter company; and that it was desirable to terminate existing disputes, and embody the agreement of the parties in one new contract, in lieu of said existing contract.

The expressed purpose of this agreement was to provide telegraph facilities for the parties, and to maintain and operate the lines of telegraph along all the railway company's roads in the most economical manner in the interest of both parties, as well as to fulfil the obligations of the railway company to the Government of the United States and the public, in respect to the telegraphic service required by the act of July 1, 1862, and its amendments.

Among other provisions of the above agreement are the following:

"Third. The railway company, so far as it legally may, hereby grants and agrees to assure to the telegraph company the exclusive right of way on, along, upon, and under the line, lands, and bridges of the railway company and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires, or either of them, or underground or other system of communication for commercial or public uses or business, with the right to put up from time to time, or cause to be put up or constructed under the provisions of this agreement, such additional wires on its own or the railway company's poles or such additional lines of poles and wires or either as well on its bridges as on its right of way, or to construct such underground lines as the telegraph company may deem expedient, doing as little damage and causing as little inconvenience to the railway company as is practicable, and the railway company will not transport men or material for the construction or operation of a line of poles and wire or wires or underground or other system of communication in competition with the lines of the telegraph company, party hereto, except at and for the railway company's regular local rates, nor will it furnish for any competing line any facilities or assistance that it may lawfully withhold, nor stop its trains, nor distribute material therefor at other than regular stations: *Provided always*, That in protecting and defending the exclusive rights

given by this contract, the telegraph company may use and proceed in the name of the railway company, but shall indemnify and save harmless the railway company from any and all damages, costs, charges, and legal expenses incurred therein or thereby.

"Fourth. It is mutually understood and agreed that all of the telegraph lines and wires covered by this contract, whether belonging to or used by the telegraph company or the railway company for the purpose of this contract, as herein provided, shall form part of the general system of the telegraph company. The railway company further agrees that its employés shall transmit over the lines owned, controlled, or operated by the parties hereto, all commercial telegraph business offered at the railway company's offices, and shall account to the telegraph company exclusively for all of such business and the receipts thereon, as provided herein. No employé of the railway company shall, while in its service, be employed by or have any connection with any other telegraph company than the telegraph company party hereto, and the telegraph company shall have the exclusive right to the occupancy of and connection with the railway company's depots or station houses for commercial or public telegraph purposes as against any other telegraph company: *Provided*, That if any person or party, or any officer of the Government, tender a message for transmission over the railway telegraph lines between Council Bluffs and Ogden at any railway telegraph station between those points and require that the service be rendered by the railway company, the operator to whom the same is tendered shall receive and forward the same accordingly at rates to be fixed by the railway company to the point of destination if not beyond its own lines. If the destination of said message be beyond said railway company's lines, the telegraph company, when receiving the same at the point at which it leaves the said railway lines, may demand the prepayment of tolls for the service of forwarding the message on its own lines: *Provided, however,* That the local receipts of the railway company on such messages shall be divided between the parties hereto in the same manner and subject to

the same conditions as provided in the tenth clause of this agreement."

"Sixth. Each party hereto shall pay one-half of the entire cost of all poles, wires, insulators, tools, and other material used for the maintenance, repair, and renewal or reconstruction of existing lines and wires along all of the railway company's railroads, and for the construction, maintenance, repair, and renewal or reconstruction of such additional wires or lines of poles and wires as may be required for commercial or railroad telegraph purposes along said railroads, and along future branches or extensions thereof, and along new railroads constructed or acquired by the railway company, until the total number of wires shall amount to three for the exclusive use of each party hereto between Council Bluffs and Ogden, two for the exclusive use of each party hereto between Kansas City and Denver, and one for the exclusive use of each party hereto on all other portions of the railway company's railroads, branches, and extensions. Each party hereto shall pay the entire cost of the construction, maintenance, repair, and renewal or reconstruction of wires for its exclusive use in excess of the number hereinbefore mentioned. The material of the telegraph company for additional wires to be transported free of charge by the railway company over its own lines, as hereinafter provided. The telegraph company agrees to furnish at its own expense all blanks and stationery for commercial or other public telegraph business, and all instruments, main and local batteries, and battery material for the operation of its own and the railway company's wires and offices. . . .

"Seventh. . . . The telegraph company agrees to furnish, free of charge, for the railroad business of the railway company, a direct wire connecting the railway company's office in Omaha, Nebraska, with its office in Kansas City, Missouri, and with the railway company's offices at intermediate railroad stations of the railway company along the Missouri River, including Council Bluffs; and the telegraph company will receive, transmit, and deliver, free of charge, at and from its offices at said intermediate stations of the railway company, such messages on the railroad business of the railway company

as may be offered by its agents and officers for points on the railway company's roads, provided that the telegraph company may use said wire for the transaction of commercial or public telegraph business when not in use for railroad business.

"Eighth. All messages of the officers and agents of the railway company pertaining to its railroad business may be transmitted free of charge between all telegraph stations on the lines of its various railroads over wires set apart for railroad business. . . . It is understood and agreed that the free telegraphic service herein provided for is for the transmission of messages concerning the operation and business of the railway company's railroads, and shall not be extended to messages ordering sleeping car, parlor car, or steamer berths, or other accommodations for customers of the railway company, the tolls on which messages should properly be chargeable to such customers.

"Ninth. The railway company agrees to transport free of charge over its railroads, upon application of the superintendent or other officer of the telegraph company, all officers of the telegraph company when travelling on its business, and all employés of the telegraph company when travelling on the telegraph company's business connected with or pertaining to the lines or wires and offices along any of the railway company's railroads. And the railway company further agrees to transport and distribute free of charge along the line of any and all its railroads all poles and other materials for the construction, maintenance, operation, repair, or reconstruction of the lines and wires covered by this agreement, and of such additional wires or lines of poles and wires as may be erected under and in pursuance of the provisions of this agreement. Also all material and supplies for the establishment, maintenance, and operation of the offices along said railroads, it being understood that no charge shall be made for the transportation of poles or other materials over any of the railway company's railroads for use on any other of its railroads.

"Tenth. The telegraph company agrees to supply instruments and local batteries and blanks and stationery for commercial telegraph business, as hereinbefore provided at offices

. established and maintained by the railway company. At all telegraph stations of the railway company its employés shall receive, transmit, and deliver such commercial or public messages . as may be offered, and shall render to the telegraph company monthly statements of such business and full accounts of all receipts therefrom, and the railway company shall cause all· of such receipts to be paid over to the telegraph company monthly.

" As compensation to the railway company for the services herein provided for, the telegraph company agrees to pay or return to the railway company monthly one-half of the cash receipts at telegraph stations maintained and operated by and at the expense of the railway company, tolls on ocean cable messages and tolls for lines of other companies excepted, all of which shall be retained by the telegraph company, it being understood that the railway company shall not be entitled to any portion of the tolls on ocean cable messages or tolls belonging to lines of other companies or to any portion of amounts checked against other offices. . . .

" The railway company agrees that its employés shall not compete with the telegraph company's offices in the transaction of commercial telegraph business at any point where the telegraph company may now or hereafter have an office separate from the railway company's office, by cutting rates or by active efforts to divert business from the telegraph company."

" Twelfth. It is further agreed that the management of the .wires, the repairs of all the lines along the railway company's railroads, and the distribution of all materials for use on said lines, shall be under the supervision and control of a competent superintendent, who shall be appointed and paid jointly by the parties hereto, and whose salary shall be fixed by mutual agreement, and said superintendent shall be equally the servant of each of the parties hereto, and shall, as far as practicable, protect and harmonize the interest of both parties hereto in the transaction of the railroad and commercial telegraph business along the railway company's railroads. . .

" Thirteenth. The railway company shall have the right to the free use of any telegraphic patent rights or new discoveries or inventions that the telegraph company now owns

and uses in its general telegraph business or which it may hereafter own and use as aforesaid, so far as the same may be necessary to properly carry on the business of railroad telegraphing on the line of said railroads as provided for herein.

"Fourteenth. The telegraph company hereby promises and agrees to assume and protect the railway company from the payment of all taxes levied and assessed upon the telegraph property belonging to either of the parties to this agreement.

"Fifteenth. The provisions of this agreement shall extend to all railroads and branches or extensions thereof now or hereafter owned or controlled by the railway company, provided, however, that in case the railway company shall hereafter acquire the ownership or control of any railroad, upon which the telegraph company may already have a line of telegraph in operation, the provisions of this contract shall not apply to such railroad and telegraph line without the mutual consent of the parties hereto at the time of such acquisition."

The contract of 1881 was, by its terms, to continue in force for twenty-five years, and existing contracts with other companies, and in respect to other roads, were to be deemed superseded, so long as the last contract was fully observed on the part of the railway company, but to be again in force, for the protection of the Western Union Telegraph Company, in case this contract should not be kept in good faith by the railway company for the full term of twenty-five years.

By the decree of the Circuit Court it was further adjudged that the Union Pacific Railway Company "at once put an end to all relations between it and the defendant, the Western Union Telegraph Company, not equally allowed to all other persons or corporations operating, owning, or using the telegraph as a means of communication, and also at once resume possession of its offices, poles, wires, instruments, and all its other property belonging or appertaining to the business of telegraphy along such of its main and branch lines as were aided by the Government under the act of July 1, 1862, and acts amendatory and supplemental thereto, and henceforth, by and through its own corporate officers and employés, maintain and operate, for railroad, governmental, commercial, and

other purposes, such telegraph lines and instruments, and in all ways exercise by itself alone all the telegraph franchises conferred upon it and obligations assumed by it under the several acts granting subsidies in land or bonds or loan of credit to it and to its constituent companies, or the acts amendatory of or supplemental thereto; and in all cases where the said defendant company has not now adequate facilities to enable it to thus conduct the telegraph business and afford equal facilities to all without discrimination in favor of or against any person, company, or corporation whatever, and to receive, deliver, and exchange business with connecting telegraph lines and all companies desiring to make such connections on equal terms and afford equal facilities to all, and without discrimination for or against any one of such connecting lines and upon just and equitable terms (all of which said defendant is required and directed to at once proceed to do), then said defendant shall at once construct and provide such facilities as are necessary to carry out the provisions of this decree and the several acts of Congress creating or aiding said defendant company or its constituent parts and all acts amendatory and supplemental thereto."

It was further adjudged that the Western Union Telegraph Company "at once vacate all the offices of said railway company without interference or damage to the same, and without removing, until the further order of this court, any property therefrom or from the line of said railway company which has heretofore been jointly used by the two companies, or the ownership of which is in dispute or is so connected with or mixed with the property of the railway company as to make it difficult of identification, or the removal of which will interrupt or interfere with the discharge of the duties of the defendant railway company, as herein set forth and enjoined;" this decree, however, not to be construed as preventing the railway company from leasing to the telegraph company "the right to occupy with its wires, instruments, batteries, and operators, upon reasonable and proper terms, any of its poles along the right of way and space in the depots or stations of the said the Union Pacific Railway Company not required by the railway company for the transaction of its business."

Sixty days after the entry of the decree were given to make such necessary arrangements, adjustments, and changes as might become necessary by reason of annulling the above agreements, and in order that the provisions of the decree might be carried into effect.   And the right was reserved to the telegraph company to apply for and have stated an account between the defendants in respect of the value of the telegraph property along the line of the railway company, the cost of maintenance and profits of the telegraph lines, the amounts contributed thereto by the respective defendants or their assignors or predecessors in title, and all matters affecting the equities of the defendants — the United States to have the right to intervene on such accounting for the protection of its interests and those of the public.   50 Fed. Rep. 28.

Upon appeal by the defendants to the United States Circuit Court of Appeals the decree of the Circuit Court was reversed, and the cause remanded with directions to enter a modified decree adjudging, among other things, that the agreement of October 1, 1866, was a lawful and binding contract, and continued in force until it was superseded by the agreement of July 1, 1881; that the agreements of September 1, 1869, and December 14, 1871, were beyond the powers of the Union Pacific Railroad Company, and must be annulled; that the equities arising out of the two last-named agreements were adjusted and settled by the parties interested when they made the contract of July 1, 1881; and, that the last-named agreement was valid and binding in all respects, except that the third and fourth paragraphs were null and void to the extent, and only to the extent, that they secured or granted, or were intended to secure and grant, to the Western Union Telegraph Company any exclusive rights, privileges, or advantages whatsoever.   19 U. S. App. 531; *S. C.* 59 Fed. Rep. 813.

Before examining the provisions of the agreements that were annulled by the decree of the Circuit Court, it is necessary to ascertain the nature and extent of the obligations imposed upon the Union Pacific Railroad Company and the other constituent companies of the Union Pacific Railway

Company, in respect of the construction, maintenance, and operation of telegraph lines along the routes of their respective roads. If it be found that the Union Pacific Railway Company, in the exercise of the rights and powers of its constituent companies, was not, prior to the passage of the act of August 7, 1888, under any legal duty, in addition to the construction of a railroad on the routes prescribed, to maintain or operate telegraph lines on or along its roadways, the question will arise, whether it was competent for Congress to require that company, through its own officers and employés exclusively, to maintain or operate telegraph lines on or over its roadways, to be used for railroad, governmental, commercial, and other purposes, and itself alone exercise the telegraph franchises conferred by the acts of Congress.

The Union Pacific Railroad Company was created by the above act of Congress of July 1, 1862. 12 Stat. 489, c. 120. Its title indicated that the subsidy granted was to aid in the construction of both a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes.

Proceeding under that act, the company began in 1865, and in 1869 completed, the construction of a railroad from Omaha to Ogden, making connection at the latter place with the Central Pacific Railway, extending from Ogden to San Francisco. It also constructed, on the north side of its right of way, a telegraph line between Omaha and Ogden.

By the first section of the above act of July 1, 1862, the Union Pacific Railroad Company was authorized and empowered "to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph" from a named point in the then Territory of Nebraska to the western boundary of Nevada Territory; by the second section, a right of way through the public lands was given "for the construction of said railroad and telegraph line;" by the third section, a grant of public lands was made "for the purpose of aiding in the construction of said railroad and telegraph line;" by the fourth section, patents for lands granted were to be issued

upon the certificate of commissioners appointed by the President, when it appeared that forty consecutive miles of the " railroad and telegraph line " had been completed and equipped in all respects as required, and were ready for the service contemplated by the act; by the fifth section, provision was made for issuing to the company bonds of the United States that should constitute a first mortgage on the whole line of " the railroad and telegraph, together with the rolling stock " — such bonds to be issued when the commissioners certified to the completion and equipment of forty consecutive miles of " railroad and telegraph," in accordance with the provisions of the act; by the sixth section, the grants of land were declared to be made " upon condition that said company shall pay said bonds at maturity and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit despatches over said telegraph line," etc. ; by the seventh section, the company was required, within one year after the passage of the act, to file its assent to its provisions, and complete said " railroad and telegraph " from the point of beginning as provided to the western boundary of Nevada Territory before the first day of July, 1874; and by the eighth section, " the line of said railroad and telegraph " was prescribed.

The ninth section authorized the Leavenworth, Pawnee and Western Railroad Company — which, prior to January 1, 1862, had located its line of road from Leavenworth to Fort Riley — to construct a railroad and telegraph line from the Missouri River, at the mouth of the Kansas River, on the south side thereof, so as to connect with the Pacific Railroad of Missouri at the aforesaid point, on the one hundredth meridian of longitude west of Greenwich, upon " the same terms and conditions in all respects " as were provided in the act for the construction of the railroad and telegraph line first mentioned, and to meet and connect with the same at the meridian of longitude named. The same section authorized the Central Pacific Railroad Company, a California corporation, to construct " a railroad and telegraph line " from the Pacific coast, at or near San Francisco or the navigable waters of the Sacramento River, to the eastern boundary of that State, " upon the same

terms and conditions, in all respects, as are contained in this act for the construction of said railroad and telegraph line first mentioned, and to meet and connect with the first-mentioned railroad and telegraph line on the eastern boundary of California."

The tenth section authorized the Kansas and California companies, or either of them, after completing their roads, to unite upon equal terms with the first-named company in constructing so much of said "railroad and telegraph line and branch railroads and telegraph lines" in the act mentioned, through the Territories from the State of California to the Missouri River, as shall then remain to be constructed, on the same terms and conditions as provided in relation to the said Union Pacific Railroad Company. And the Hannibal and St. Joseph Railroad, the Pacific Railroad Company of Missouri, and the first-named company, or either of them, on filing their assent to the act, were authorized to unite upon equal terms, with the said Kansas company, in constructing said railroad and telegraph, to said meridian of longitude, with the consent of the said State of Kansas; "and in case said first-named company shall complete its line to the eastern boundary of California before it is completed across said State by the Central Pacific Railroad Company of California, said first-named company is hereby authorized to continue in constructing the same through California, with the consent of said State, upon the terms mentioned in this act, until said roads shall meet and connect, and the whole line of said railroad and telegraph is completed; and the Central Pacific Railroad Company of California, after completing its road across said State, is authorized to continue the construction of said railroad and telegraph through the Territories of the United States to the Missouri River, including the branch roads specified in this act, upon the routes hereinbefore and hereinafter indicated, on the terms and conditions provided in this act in relation to the said Union Pacific Railroad Company, until said roads shall meet and connect, and the whole line of said railroad and branches and telegraph is completed."

By the eleventh section it was provided, in respect of bonds

issued in aid of the construction of the most mountainous and difficult parts of the road, that "no more than fifty thousand of said bonds shall be issued under this act to aid in constructing the main line of said railroad and telegraph;" by the twelfth section, that "the whole line of said railroad and branches and telegraph shall be operated and used for all purposes of communication, travel, and transportation, so far as the public and Government are concerned, as one connected, continuous line;" and by the fourteenth section, that the Union Pacific Railroad Company should construct a single line of railroad and telegraph from the western boundary of Iowa, at a point to be designated by the President, so as to form a connection with that company's line on the said one hundredth meridian of longitude, upon the same terms and conditions prescribed "for the construction of said railroad and telegraph first mentioned;" and whenever a railroad was constructed through Minnesota or Iowa to Sioux City, then the above company should construct a railroad and telegraph line from Sioux City to connect with the Union Pacific Railroad.

The fifteenth section declared that any company then or thereafter incorporated should have the right to connect its road with the road and branches provided by the act, at such places and upon such terms as the President might prescribe. But by an act of Congress, passed June 20, 1874, 18 Stat. 111, c. 331, the following addition was made to this section of the act of July 1, 1862, 12 Stat. 489, 496, c. 120: "And any officer or agent of the companies authorized to construct the aforesaid roads, or of any company engaged in operating either of said roads, who shall refuse to operate and use the road or telegraph under his control, or which he is engaged in operating for all purposes of communication, travel, and transportation, so far as the public and the Government are concerned, as one continuous line, or shall refuse, in such operation and use, to afford and secure to each of said roads equal advantages and facilities as to rates, time, or transportation, without any discrimination of any kind in favor of, or adverse to, the road or business of any or either of said companies, shall be deemed guilty of a misdemeanor, and, upon conviction thereof,

shall be fined in any sum not exceeding one thousand dollars, and may be imprisoned not less than six months; . . . and it is hereby provided that for all the purposes of said act, and of the acts amendatory thereof, the railway of the Denver Pacific Railway and Telegraph Company shall be deemed and taken to be a part and extension of the road of the Kansas Pacific Railroad, to the point of junction thereof with the road of the Union Pacific Railroad Company at Cheyenne, as provided in the act of March third, eighteen hundred and sixty-nine."

The sixteenth section of the act of 1862 further provided that all of the railroad companies mentioned in the act, or any two or more of them, might form themselves into one consolidated company, the latter company to proceed thereafter " to construct said railroad and branches and telegraph line upon the terms and conditions provided in this act."

The seventeenth section provided that in case said company or companies failed to comply with the terms and conditions of the act " by not completing the said road and telegraph and branches within a reasonable time, or by not keeping the same in repair and use, but shall permit the same, for an unreasonable time, to remain unfinished, or out of repair, and unfit for use, Congress may pass any act to insure the speedy completion of said road and branches, or put the same in repair and use, and may direct the income of said railroad and telegraph line to be thereafter devoted to the use of the United States, to repay all such expenditures caused by the default and neglect of such company or companies."

The eighteenth section provided that whenever it appeared that " the net earnings of the entire road and telegraph," including the amount allowed for services rendered for the United States, after deducting all expenditures, including repairs, and the furnishing, running, and managing of said road, shall exceed ten per centum upon its cost, exclusive of the five per centum to the United States, Congress could reduce the rates of fare thereon, if unreasonable in amount, and fix and establish the same by law. And "the better to accomplish the object of this act, namely, to promote the public interest and welfare by the construction of said railroad and

telegraph line, and keeping the same in working order, and to secure to the Government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes, Congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act."

The act of July 1, 1862, was amended, in various particulars, by the act of July 2, 1864, c. 216.  13 Stat. 356.  By the tenth section of the latter act the former was so amended that the Union Pacific Railroad Company, the Central Pacific Railroad Company, and other companies authorized to participate in the construction of the proposed lines of road, could "issue their first mortgage bonds on their respective railroad and telegraph lines to an amount not exceeding the amount of the bonds of the United States," and "the lien of the United States shall be subordinate to that of the bonds of any or either of said companies, hereby authorized to be issued on their respective roads, property, and equipments," except as to those provisions of the act of 1862, relating to the transmission of despatches, and the transportation of mails, troops, munitions of war, supplies and public stores of the United States.

Section fifteen of the same act was in these words: "That the several companies authorized to construct the aforesaid roads are hereby required to operate and use said roads and telegraph for all purposes of communication, travel, and transportation, so far as the public and the Government are concerned, as one continuous line; and, in such operation and use, to afford and secure to each equal advantages and facilities as to rates, time, and transportation, without any discrimination of any kind in favor of the road or business of any or either of said companies, or adverse to the road or business of any or either of the others, and it shall not be lawful for the proprietors of any line of telegraph, authorized by this act, or the act amended by this act, to refuse or fail to convey for all persons requiring the transmission of news and messages of like character, on pain of forfeiting to the person injured, for each offence, the sum of one hundred dollars, and such other damage as he may have suffered on account of said refusal or failure,

to be sued for and recovered in any court of the United States, or of any State or Territory of competent jurisdiction."

The sixteenth section provided that any two or more of the companies authorized to participate in the benefits of that act might at any time unite and consolidate upon such terms and conditions as were not incompatible with such act or the laws of the State or States in which the roads of such companies were, and such consolidated company should be entitled to receive from the Government all the grants, benefits, and immunities that the respective constituent companies were entitled to, subject to all the restrictions imposed upon them.

By the twenty-second section it was declared that " Congress may, at any time, alter, amend, or repeal this act."

In our judgment, it is not difficult to ascertain the intention of Congress in passing the acts of July 1, 1862, and the amendatory act of July 2, 1864, c. 216. The supreme object to be attained was the maintenance and operation of both a railroad and telegraph line from the Missouri River to the Pacific Ocean, and governmental aid was extended in order to accomplish a result so important to the whole country.

The authority given to the Union Pacific Railroad Company to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad *and telegraph* line on that route, § 1; the grant of public lands *for the purpose* of aiding in the construction of said railroad *and telegraph line*, § 3; the direction that patents for lands granted should be issued as each forty consecutive miles of such railroad *and telegraph line* appeared, upon the certificate of commissioners, appointed by the President, to have been completed and *equipped* in all respects as required, § 4; the making the bonds of the United States a first mortgage on the whole line of the railroad *and telegraph*, § 5; the explicit declaration that the grants of public lands were made *upon the condition*, among others, that *the company* should keep said railroad *and telegraph line* in repair and *use*, and at all times transmit despatches over said *telegraph line*, § 6; the requirement that the company should complete said railroad *and telegraph* on the route prescribed and within a named time, § 7; the reservation that Congress may at any

time, having due regard to the rights of the companies named, add to, alter, amend, or repeal the act in order that it may better accomplish the object of the government, namely, "to promote the public interest and welfare by the construction of" said railroad *and telegraph line,* and keep the same in working order, and to secure to the government at all times (but particularly in time of war) "the use and benefits of the same for postal, military, and other purposes," § 18; these and other provisions are wholly inconsistent with the idea that the Union Pacific Railroad Company could have fulfilled its obligations to the government by simply constructing a railroad, without making any provision whatever for the construction, maintenance, or operation of a telegraph line, thereby leaving all communication by telegraph, along its route, to the absolute control of private corporations deriving no corporate authority from the National Government, and whose operations would not ordinarily be subjected to national supervision.

The same observations are applicable to the Leavenworth, Pawnee and Great Western Railroad Company — afterwards, and successively, as has been stated, the Union Pacific Railway Company, Eastern Division, and the Kansas Pacific Railway Company. That corporation was authorized to construct not simply a railroad, but a railroad *and telegraph line,* between certain points, upon the same *terms and conditions* as were prescribed in the act for the construction of a railroad *and telegraph line* by the Union Pacific Railroad Company.

The purpose of Congress, as indicated in the act of 1862, to provide for the construction of telegraph lines by the companies named in it, in connection with their respective railroads, was unchanged at the time of the passage of the amendatory act of July 2, 1864, c. 216. The latter act, as we have seen, gave authority to the companies authorized to participate in the construction of the roads that were to connect the Missouri River with the Pacific Ocean to place a first mortgage on their respective railroads *and telegraph lines,* and made the mortgage held by the United States subordinate to it. § 10. It did more. It required those companies to operate and use their roads *and telegraph* for all purposes of communication,

travel, and transportation, so far as the public and government were concerned, "as one connected, continuous line," and without discrimination against either road — a requirement that would not have been made if Congress had not intended that each company receiving aid from the government should itself maintain and operate or control, or should provide for the maintenance, on its own route, and under its own control, of a telegraph line for the accommodation of both the government and the general public.

What we have said as to the objects that Congress intended to accomplish by aiding the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean is based upon sections one to eighteen, inclusive, of the act of July 1, 1862, and upon the provisions of the amendatory acts of July 2, 1864, c. 216, and June 20, 1874, 18 Stat. 111, c. 331. If we look alone to those sections and provisions, the conclusion must be that any company named in the act of 1862, and receiving the aid therein granted by the government, was required itself, and through its own officers and employés, to construct, maintain, and operate both a railroad and telegraph line, and could not assign or transfer to any other corporation its franchises in that regard.

But there is a section in the act of 1862 showing that, for the benefit of certain telegraph companies that had already expended large sums in the construction of telegraph lines, Congress was willing, in a named contingency, to relieve the railroad companies receiving governmental aid, from, at least, any present obligation to construct telegraph lines on their respective rights of way. That contingency is indicated in the nineteenth section of the act of 1862, which provides:

"That the several railroad companies herein named are authorized to enter into an arrangement with the Pacific Telegraph Company, the Overland Telegraph Company, and the California State Telegraph Company, so that the present line of telegraph between the Missouri River and San Francisco may be moved upon or along the line of said railroad and branches as fast as said roads and branches are built; and if said arrangement be entered into, and the transfer of said tele-

graph line be made in accordance therewith to the line of said railroad and branches, such transfer shall, for all purposes of this act, be held and considered a fulfilment on the part of said railroad companies of the provisions of this act in regard to the construction of said line of telegraph. And, in case of disagreement, said telegraph companies are authorized to remove their line of telegraph along and upon the line of railroad herein contemplated without prejudice to the rights of said railroad companies named herein."

A similar provision relating to the Union Pacific Railroad Company and the United States Telegraph Company and its associates was embodied in the fourth section of the act of Congress, commonly known as the Idaho act, of July 2, 1864, c. 220, 13 Stat. 373, entitled "An act for increased facilities of telegraph communication between the Atlantic and Pacific States and the Territory of Idaho."

By the latter act the United States Telegraph Company and their associates were authorized to erect a line or lines of magnetic telegraph between the Missouri River and San Francisco on such routes as they might select, to connect with its lines then constructed and being constructed through the States of the Union. It was given the use of such unoccupied land of the United States as was necessary for right of way, and materials, and for the establishing of stations along said line for repairs, not exceeding at any station one quarter-section of land, and such stations not to exceed one in fifteen miles on the average of the whole line, unless said lands should be required by the government of the United States for railroad or other purposes. § 1. Under the direction of the President of the United States it was authorized to erect a telegraph line from Fort Hall to Portland, Oregon, and from Fort Hall to Bannock and Virginia City, in the Territory of Idaho, with the same privileges as to the right of way, and so forth, as provided in the first section; the United States to have priority in the use of said lines of telegraph to Oregon and Idaho. § 2. It was authorized to send and receive despatches, on payment of the regular charges for transmission, over any line then or thereafter to be constructed by the

authority or aid of Congress, to connect with any line or lines authorized or erected by the Russian or English governments, and all despatches received by its line or lines were to be transmitted in the order of their reception, and the answers delivered to the United States Telegraph Company for transmission over their lines to the office whence the original message was sent, whenever so directed by the sender thereof. § 3.   By the fourth section it was provided: "The several railroad companies authorized by the act of Congress of July one, eighteen hundred and sixty-two, are authorized to enter into arrangements with the United States Telegraph Company so that the line of telegraph between the Missouri River and San Francisco may be made upon and along the line of said railroads and branches as fast as said roads and branches are built, and if said arrangements be entered into and the transfer of said telegraph line be made in accordance therewith to the line of said railroads and branches, such transfer shall, for all purposes of the act referred to, be held and considered a fulfilment on the part of said railroad companies of the provision of the act in regard to the construction of a telegraph line; and, in case of disagreement, said telegraph company are authorized to remove their line of telegraph along and upon the lines of railroad therein contemplated, without prejudice to the rights of said railroad companies."

Referring to the nineteenth section of the act of 1862, Mr. Justice Miller, in *Western Union Tel. Co.* v. *Union Pacific Railway*, 3 Fed. Rep. 721, 728, (1 McCrary, 581, 588,) said: "The three telegraph companies here spoken of, together constituted, at the time this statute was passed, a continuous line of telegraph from the Missouri River to San Francisco; and it was obvious that the building of another line parallel to that, and not far distant from it, would have a very injurious effect upon the value of the property of those telegraph companies; and it was to protect those companies and to prevent the injury which would follow from the construction of another line between the same points, over an uninhabited region of country, that Congress provided that, by an arrangement with the railroad company, if those companies should remove their

wires along the line of that road so they could be used both for railroad purposes and the use of the general public, then the obligation of the railroad company under the act of Congress to build another line should no longer exist."

In reference to the fourth section of the Idaho act, the same eminent Justice said: "It does not admit, in my opinion, of any reasonable doubt that if the United States Telegraph Company mentioned in that statute, or any company which had the same rights and authorities on that subject that that company had, entered into an agreement with the Pacific Railroad Company, or any of its branches built under the authority of the original act of 1862, which secures the proper construction and operation of a line of telegraph along its road for the benefit of the public, that it is absolved from the obligation imposed upon it by the act of 1862, to construct and operate such a telegraph line. It was manifestly the design of this act of 1864 to enable the United States Telegraph Company to become substituted, by a proper arrangement with the Pacific Railroad Company and its branches, to the right to build a telegraph line along the track and right of way of those railroad companies, and thereby to relieve those companies from the obligation to build and operate such a line." Id. 727.

We concur in these observations as to the scope and effect of the nineteenth section of the act of 1862, and of the like section in the Idaho act of July 2, 1864, c. 220. But it must be observed that the transfer to the roadway of the Union Pacific Railroad of the lines of the telegraph companies, or either of them, named in the nineteenth section of the act of 1862, was not in pursuance of any "arrangement" made with those companies. On the contrary, as stated by counsel, the lines constructed by telegraph companies between Omaha and Ogden, and operated by the Western Union Telegraph Company prior to the actual completion of the railroad between those points, were transferred to the south side of the railroad as the work of railroad construction proceeded, without any arrangement whatever with the railroad company. This was done under that clause in the nineteenth section of the act of

1862, providing that "in case of disagreement said telegraph companies are authorized to remove their line of telegraph along and upon the line of railroad herein contemplated without prejudice to the rights of said railroad companies named herein."

In reference to the telegraph line from Kansas City via Lawrence and Rossville to Denver, the claim is, that a part of it was constructed under some arrangement between the railroad company and Samuel Hallett, contractor; that the balance was constructed under the contract of October 1, 1866, between the Western Union Telegraph Company and the Kansas Pacific Railroad Company, the latter contracting by the name it then used of the Union Pacific Railway Company, Eastern Division; and that after that date and until 1880, the line of telegraph extending from Kansas City to Denver was operated under the contract of October 1, 1866. It is further claimed that the telegraph line so constructed was accepted by the Government as a substitute for the line which the charter of the railroad company required it to construct, maintain, and operate.

If it were true that the telegraph line on the Kansas Pacific branch was constructed on the roadway of the railroad company under such an "arrangement" with the railroad company as was contemplated or permitted by the fourth section of the Idaho act, and that the Government, by not declaring to the contrary, is to be deemed to have accepted the construction by the telegraph companies of a line on the south side of the right of way of the Union Pacific Railroad as equivalent to an "arrangement" allowed by the nineteenth section of the act of 1862, the question would remain whether such arrangements, even if legal in all respects when made, so tied the hands of the Government that it could not, at a subsequent date, in execution of the purposes of Congress, require the railroad company, by its own officers and employés exclusively, to maintain or operate telegraph lines for railroad, governmental, and commercial purposes, on and over its roads, for the construction of which the aid of the United States was accepted.

We have seen that the object of giving governmental aid to the corporations named in the act of 1862 was to promote the

public interest and welfare by the construction and operation of a railroad and telegraph line, to the use and benefit of which the Government should be entitled at all times, particularly in time of war, for postal, military, and other purposes ; and that " the better to accomplish " that object Congress reserved the power, capable of being exercised at any time, of *adding to*, altering, amending, or repealing such act, having " due regard to the rights " of the companies named in it ; and that. by the act of 1864, c. 216, the several companies authorized to construct the roads named were required to operate and use their roads and telegraph for all purposes of communication, travel, and transportation as one connected, continuous line, affording equal advantages and facilities as to rates, time, and transportation, without discrimination against other companies, or against persons requiring the transmission of news and messages.

No express limitation is imposed upon the exercise of the power so reserved, except that the act of 1862 required that due regard be had to the rights of the railroad companies that accepted its provisions. But, looking at the entire act, it is clear that there was no purpose to interfere with the authority of Congress to enact such laws, by way of addition to or alteration of existing legislation, as were necessary or conducive to the attainment of the public objects sought to be attained. Indeed, the words in the act of 1862, " due regard for the rights of said companies named therein," suggest only such restrictions as the law, without such words, would imply.

It would not be competent for Congress, under the guise of altering and amending the act in question, to impose upon the railroad company duties wholly foreign to the objects for which it was created. or for which governmental aid was given. Neither could it, by such alteration or amendment, destroy rights actually vested, nor disturb transactions fully consummated. We may here, not inappropriately, repeat what was said in the *Sinking Fund Cases*, 99 U. S. 700, 718, 719, 720, that " this power has a limit," and " cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made." Again,

in the same case : "The United States cannot, any more than a State, interfere with private rights, except for legitimate governmental purposes. They are not included within the constitutional prohibition which prevents States from passing laws impairing the obligation of contracts, but equally with the States they are prohibited from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen. No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable."

But it cannot be doubted that the act of 1888 is within the general scope, and consistent with the objects, of the previous statutes relating to railroad and telegraphic communication between the Missouri River and the Pacific Ocean. If Congress concluded — and we must assume, from the provisions of the act of 1862, that it did conclude — that the public interests and the general welfare would be promoted if the railroad company, accepting national aid, should exercise through its own officers and employés exclusively, the telegraphic franchises granted to it, it is difficult to perceive how legislation designed to enforce such a policy can be held to be wanting in due regard to the rights of such company.

It may be that Congress passed the act of 1888 because, in its judgment, the rights of the Government and of the public, in the matter of telegraphic communication, could be fully secured or effectively guarded only by means of telegraph lines maintained and operated by a corporation deriving its power from the General Government, and subject, in respect

of the general conduct of its affairs, to national supervision and control. If such considerations induced the passage of the act of 1888, can the validity of that legislation be made to turn upon the inquiry by the courts whether the policy inaugurated by Congress was best for the public interests? Can it be said that the act of 1888 is not germane or related to the objects for the attainment of which the aid of the Government was bestowed, as indicated in the act of 1862? These questions must be answered in the negative. We have nothing to do with the wisdom or policy of legislation. The discretion of Congress in such matters cannot be controlled by the judiciary, nor can the courts disregard an act of legislation merely upon the ground that the public interests would, in their judgment, have been best subserved by leaving telegraphic communications, along the route of railroads constructed with national aid, under the domination of private corporations organized under state authority. We can consider only the question of legislative power. If the power existed to enact the statute of 1888, the duty of the courts is to give full effect to the will of Congress. No other position can be taken without attributing to the judiciary an authority to revise the action of the legislative branch of the Government that it does not possess, and which the established principles of our Government forbid it to exercise.

The contention that the act of 1888 did not have due regard to the rights of the railroad company is based upon that provision in the act of 1862 (§ 19), and a similar provision in the act of 1864 (§ 4), which permitted the railroad company to make an "arrangement" with certain telegraph companies to place their lines upon and along the route of the railroad and branches — such transfer to be held and considered, for all the purposes of the act, a *fulfilment* on the part of said railroad companies of the provisions of the act "in regard to the *construction* of said lines of telegraph." But such an arrangement, accompanied by the transfer of telegraph lines constructed by telegraph companies to the roadway of the railroad company, had no other effect than to relieve the railroad company from any *present* duty itself to construct a telegraph

line to be used under the franchises granted and for the purposes indicated by Congress. It did not affect the authority of Congress, under its reserved power, to require the railroad company itself to maintain or operate in the future, by its officers and employés alone, telegraph lines on its main road and branches.

Indeed, no arrangement of the character specified could have been made, except in full view of the power reserved to add to, alter, or amend the act that permitted it. Although, as just stated, that power could not have been exercised, so as to divest either the railroad company or the telegraph company of property already acquired, or to disturb or annul any transaction fully consummated, while such arrangement was in force, it was competent for Congress to make such additions to, or such alterations or amendments of, previous statutes, as would secure the maintenance or operation by the railroad company, through its own officers and employés, of a telegraph line over and along its main line and branches.

It is of no consequence that such legislation may defeat the purpose contemplated by the parties to an arrangement of the character described; for they contracted, and could only have contracted, in view of the possible exercise by Congress of the power expressly reserved by it. If we should hold the addition made by the act of 1888 to the act of 1862, and the acts amendatory thereof, to be beyond the power of Congress, it would be difficult, if not impossible, to prescribe the lines within which the national legislature must keep, and beyond which it may not pass, when exerting its reserved power of adding to, altering, or amending statutes and charters of incorporation.

We have, therefore, considered the question before us just as if a contract or arrangement, between the railroad and a telegraph company, for the construction by the latter of a telegraph line on the route of the former, expressly recited the provision of the act of 1862, by which Congress reserved the power, to be exerted at any time, to add to, amend, or repeal the act which authorized such contract or arrangement.

In this view, it must be held that by its reservation of authority to add to, alter, amend, or repeal the acts in question,

whenever it chose so to do, Congress, subject to the limitation that rights actually vested or transactions fully consummated could not be disturbed, intended to keep within its control the entire subject of railroad and telegraphic communication between the Missouri River and the Pacific Ocean, through the agency of corporations created by it, or that had accepted the bounty of the Government. It was never intended that the railroad companies, accepting such bounty, should be able, by any contract or arrangement with telegraph companies, to discharge themselves, for all time and beyond the authority of Congress otherwise to provide, from the obligation to exercise, by their officers and agents exclusively, the telegraphic franchises received by them from the National Government.

These principles are fully supported by former decisions, in which this court has determined the scope and effect of constitutional or statutory provisions that reserved to the legislature granting charters of incorporation, or enacting statutes under which private rights might be acquired, the power to alter, amend, or repeal such charters or statutes. *Tomlinson* v. *Jessup,* 15 Wall. 454, 457, 458; *Miller* v. *State,* 15 Wall. 478; *Holyoke Company* v. *Lyman,* 15 Wall. 500; *Sinking Fund Cases,* 99 U. S. 700, 720, 721; *Greenwood* v. *Freight Co.,* 105 U. S. 13, 21; *Close* v. *Glenwood Cemetery,* 107 U. S. 466, 476; *Spring Valley Water Works Co.* v. *Schottler,* 110 U. S. 347, 352; *Louisville Gas Co.* v. *Citizens' Gas Co.,* 115 U. S. 683, 696; *Gibbs* v. *Consolidated Gas Co.,* 130 U. S. 396, 408; *Sioux City Street Railway* v. *Sioux City,* 138 U. S. 98, 108; *Louisville Water Co.* v. *Clark,* 143 U. S. 1, 12, 14; *Hamilton Gas Light Co.* v. *Hamilton City,* 146 U. S. 258, 270; *N. Y. & N. E. Railroad* v. *Bristol,* 151 U. S. 556, 567.

What has been said in reference to the effect of the reservation in the act of 1862 of the right of adding to, altering, amending, or repealing its provisions, is applicable to the fourth section of the Idaho act of July 2, 1864, which permitted the several railroad companies referred to in the act of 1862 to make an arrangement with the United States Telegraph Company, such as was permitted by the nineteenth section of the act of 1862 to be made with the telegraph companies therein

named. The fourth section of the Idaho act was, in legal effect, nothing more than an amendment or enlargement of the nineteenth section of the act of 1862, by adding the name of another telegraph company to those mentioned in the latter section.

It was suggested in argument that the objects of the act of 1862 could be fully accomplished by means of a telegraph company, incorporated by one of the States, and which, by placing its lines on the route of the railroad, could meet all the demands, as well of the railroad company, as of the Government and the general public. But this suggestion can have no weight in the present inquiry. For if, as intimated, the execution of the act of 1888 will result in no real good to the general public, and may even be injurious to the pecuniary interests which the Government has in the Union Pacific Railway and its branches, that is a question of public policy, with which the judiciary is not concerned, and the responsibility for which is with another branch of the Government.

We perceive no escape from the conclusion that it is entirely competent for Congress to add to, alter, or amend the acts of 1862 and 1864, so as to require the Union Pacific Railway Company, possessing the rights and powers of its constituent companies, to maintain and operate, by and through its own officers and employés, telegraph lines, for railroad, governmental, commercial, and other purposes, and to exercise itself and alone all the telegraphic franchises conferred upon it. It is enjoying the bounty of the Government subject to the condition, among others, that it will perform these duties whenever so required by Congress.

It becomes necessary now to determine in what respects the agreements of 1866, 1869, 1871, and 1881, if kept and performed by the defendants, are inconsistent with the rights of the United States, and whether, by their necessary operation, they will interfere with the performance by the Union Pacific Railway Company of the duty imposed upon it by the act of 1888.

Looking first at the agreement of October 1, 1866, between the Union Pacific Railway Company, Eastern Division, and the Western Union Telegraph Company, it will be seen that the Western Union Telegraph Company does not, in that agree-

ment, expressly undertake to meet the obligations imposed by the Pacific Railroad acts upon the railroad companies named in them, of constructing, maintaining, and operating both a railroad and telegraph line, on their respective routes, for the use equally of the Government and the public. It does undertake to perform, without charge to the railway company, what should be "decided by competent authority" to be the telegraphic obligations of the railroad company to the Government. § 10. Whom the parties regarded as competent to decide as to the nature and extent of such obligations, does not appear from the agreement. The effect of this stipulation, as between the railway company and the telegraph company, was to excuse the latter from performing any services for the Government, until competent authority decided that such service was due from the former.

, But passing this point, as one not controlling in the case, it is evident that the effect, if not the object, of the agreement was to give the telegraph company the absolute control of all telegraphic business on the route of the Union Pacific Railway Company, Eastern Division.

The provision that the railway company should transport for the telegraph company, free of charge, all the persons engaged, and material required, in the construction, repairing, and maintaining the telegraph line for which the agreement provided, while exacting from other telegraph companies, for persons engaged and for property intended to be used, in building a telegraph line on the railway company's roadway, the usual rates for passengers and freight, §§ 4, 5 ; the stipulation that the railway company should not give permission to another telegraph company to construct or operate any telegraph line upon the lands or roadway of the railway company, without the consent in writing of the telegraph company, § 5 ; the provision that the railway company should not, without the consent of the telegraph company, transmit commercial or paid business from any station where the latter had an office; and the provision that the railway company should account for and pay over to the telegraph company, at the tariff rates established by the latter, all sums received by

the railway company for messages sent from points where the telegraph company had no separate office, if such sums were not sufficient to meet the expenses of a separate telegraph office, § 8 — these provisions, to say nothing of others, all plainly indicate that the object of the agreement was to grant to the Western Union Telegraph Company, as against all other telegraph companies, the exclusive right to control the railway company's roadway for telegraphic purposes, so far as that could be done without interfering with the ordinary operations of the railway company.

This agreement of October 1, 1866, enabling the Western Union Telegraph Company to exclude all other telegraph corporations from the roadway of the railway company, if not void as against public policy, independently of specific statutory provisions, was inconsistent with the act of Congress of July 24, 1866, 14 Stat. 221, c. 230, entitled "An act to aid in the construction of telegraph lines, and to secure to the Government the use of the same for postal, military, and other purposes." The substantial provisions of this statute have been preserved in sections 5263 to 5268, inclusive, of the Revised Statutes.

By the act of June 8, 1872, 17 Stat. c. 335, pp. 308, 309, reproduced in section 3964 of the Revised Statutes, all the waters of the United States, during the time the mail is carried thereon, and all railroads or parts of railroads in operation, are post roads. And by the above statute of 1866 Congress declared that any telegraph company then organized, or which might thereafter be organized, under the laws of any State of the Union should have the right to construct, maintain, and operate lines of telegraph through or over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which had been or might thereafter be declared such by act of Congress, and over, under, or across the navigable streams of the United States; the lines of telegraph to be so constructed and maintained as not to obstruct the navigation of streams and waters, or interfere with the ordinary travel on military or post roads. "And any of said companies," the act declared, "shall have the right to take and use from such public lands the necessary

stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance, and operation of said lines of telegraph, and may preëmpt and use such portion of the unoccupied public lands, subject to preemption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other."

The remaining sections of that act were as follows: "§ 2. That telegraphic communications between the several departments of the government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster General.  § 3. That the rights and privileges hereby granted shall not be transferred by any company acting under this act to any other corporation, association, or person: *Provided, however,* The United States may at any time, after the expiration of five years from the date of the passage of this act, for postal, military, and other purposes, purchase all the telegraph lines, property, and effects of any or all of said companies at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the Postmaster General of the United States, two by the company interested, and one by the four so previously selected. § 4. That before any telegraph company shall exercise any of the powers or privileges conferred by this act, such company shall file their written acceptance with the Postmaster General of the United States of the restrictions and obligations required by this act."

It is clear that the essential part of the agreement of 1866 is prohibited by this act of July 24, 1866.   As that act gave every telegraph company, organized under state laws, and accepting its provisions, the right to erect its poles and wires upon the post roads of the United States, the agreement of the Union Pacific Railway Company, Eastern Division, that it would not permit, except with the consent of the Western Union Telegraph Company, other telegraph companies to use its roadway,

directly tended to make the act of July 24, 1866, ineffectual, and was, therefore, hostile to the object contemplated by Congress. *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1, 11. The railway company operating one of the post roads of the United States, over which interstate commerce was carried on, could not, at least after the passage of that act, grant to any one or more telegraph companies the exclusive right to use its roadway for telegraphic purposes.

But it is contended that the agreement of 1866 was authorized by the Idaho act of 1864.

That act, as we have said, authorized the several railroad companies, named in the act of July 1, 1862, to enter into an "arrangement" with the "United States Telegraph Company" for the transfer of its telegraph line to the roadways of the railroad company, and declared that such transfer, when made, should, for all the purposes of the act of 1862, "be held and considered a fulfilment, on the part of said railroad companies, of the provisions of this act in regard to the construction of a telegraph line."

We have already determined that the Idaho act did not affect the power that Congress reserved, of adding to, altering, amending, or repealing the original and amendatory acts. It is now to be examined as to its bearing upon the validity of the agreement of October 1, 1866.

If the Western Union Telegraph Company became the successor in right and power of the United States Telegraph Company, and entitled to make any arrangement with the railroad company that its predecessor could legally have made — and such is the claim of the Western Union Telegraph Company — the question, nevertheless, remains, whether the fourth section of the Idaho act authorized any "arrangement" to be made by the Union Pacific Railway Company, Eastern Division, with the United States Telegraph Company, in conflict with the previous act of July 24, 1866. This question is not, in our judgment, difficult of solution.

The purpose of the fourth section of the Idaho act is quite apparent. Its effect was, as we have heretofore said, to relieve each of the railroad companies named in the act of 1862 from

any *present* obligation to construct a telegraph line on its road-way, by means of an "arrangement" with the United States Telegraph Company for the construction of such a line.   But no arrangement could be legally made under that act which tended, in any degree, to defeat the great objects of the act of 1862, and the act amendatory thereof, of July 2, 1864, c. 216.   The act of 1862 did not authorize the railroad company to agree that it would not itself, at some future time, construct and operate a telegraph line for the use of the Government and the people.   Nor did it, in terms or by implication, re-peal or modify the clause in that act by which Congress ex-pressly reserved the power to add to, alter, amend, or repeal, the latter act, having due regard to the rights of the railway com-panies named in it.   Certainly, it could never be held that a due regard to the rights of either the railroad company or of any corporation claiming under it required that the Govern-ment, charged by the Constitution with the duty of regulat-ing interstate commerce, should permit the railroad company receiving national aid to invest a corporation, not deriving its authority from the United States, with the exclusive right to enjoy its roadway — a national highway — for purposes of telegraphic communication between the States.

Even if the act of July 24, 1866, had never been passed, we ought not to construe the Idaho act as permitting the railway company to bind itself by agreement to give to one telegraph company a monopoly of the use of its roadway for tele-graphic purposes.   In none of the acts of Congress, having for their object the establishing of communication by rail-road and telegraph between the Missouri River and the Pacific Ocean, is there to be found anything indicating a purpose to allow the post roads of the United States, particularly those aided by the Government, to fall, for all the purposes of tele-graphic communication, under the exclusive control of one or more telegraph corporations.   On the contrary, as early as the act of June 16, 1860, c. 137, "to facilitate communication between the Atlantic and Pacific States by electric telegraph," it was declared that nothing in that act contained should confer "any exclusive right to construct a telegraph to the Pacific,

or debar the Government of the United States from granting from time to time, similar franchises and privileges to other parties." 12 Stat. 41.

If, however, it be contended that this is not the correct interpretation of the Idaho act, upon what ground can it be claimed that any arrangement could be made under the Idaho act, after the passage of the act of July 24, 1866, that was inconsistent with the latter act? Can it be said that, after the passage of the act of 1866, and while it was in force, a railway company, operating a post road of the United States, could, by any form of agreement, exclude from its roadway a telegraph company which had accepted the provisions of that act? These questions can be answered only in one way, namely, that every railroad company operating a post road of the United States, over which commerce among the States is carried on, was inhibited, after the act of July 24, 1866, took effect, from making any agreement inconsistent with its provisions or that tended to defeat its operation. The object of that act was not only to promote and secure the interests of the Government, but to obtain, for the benefit of the people of the entire country, every advantage, in the matter of communication by telegraph, which might come from competition between corporations of different States. It was very far from the intention of Congress, by any legislation, to so exert its power as to enable one telegraph corporation, Federal or state, to acquire exclusive rights over any post road, especially one for the construction of which the aid of the United States had been given, and the use of which was, to some extent, under the control of the National Government.

We are, consequently, of opinion that the agreement of October 1, 1866, was, in its essential provisions, invalid and not binding upon the railway company.

In reference to the agreements of 1869 and 1871 between the Union Pacific Railroad Company and the Atlantic and Pacific Telegraph Company, but little need be said to show that they were void. By those agreements the former corporation demised and leased to the telegraph company, to whose rights, it may be assumed, the Western Union Telegraph Company suc-

·ceeded, all the telegraph lines, wires, poles, instruments, offices, and other property appertaining to telegraph· business, that were possessed by the railroad company. These agreements were annulled by the Circuit Court, and it was likewise so adjudged by the Circuit Court of Appeals. The same conclusion had been previously announced by Judge McCrary in *Atlantic and Pacific Telegraph Co.* v. *Union Pacific Railway Co.*, 1 McCrary, 541, 547. That able judge well said: " I conclude that the charter of the Union Pacific Railroad Company devolved upon it the duty of constructing, operating and maintaining a line of telegraph for commercial and other purposes, and that this is in its nature a public duty. I am further of the opinion that, by the provisions of the contract of September 1, 1869, and of December 20, 1871, the railroad company undertook to lease or alienate property which was necessary to the performance of this duty. The consideration for these contracts is declared to be ' the demise of their telegraph lines, property and good will, and of the rights and privileges, in the manner hereinafter specified,' etc. ; and the property demised by the railroad company is ' all its telegraphic lines, wires, poles, instruments, offices, and all other property by it possessed, appertaining to the business of telegraphing, for the purpose of sending messages and doing a general telegraph business.' The lessee was to hold during the whole term of the charter of the railroad company and any renewal thereof. There is inserted a stipulation that the lessee shall perform all the duties imposed or that may be imposed upon the railroad company by their charter or by the laws of the United States. But, as already intimated, I do not think this latter clause makes the contract good. The railroad company was not at liberty to transfer to others those important duties and trusts which it, for a large consideration and for a great public purpose, had undertaken to perform. It certainly could not divest itself of these powers and duties, and devolve them upon the plaintiff, without express authority from Congress." Again : " But if the contracts in question are not *ultra vires* by reason of the transfer of property necessary to the performance, by the railroad company, of its public duties, they are so because

they attempt to transfer certain franchises of the said company. The right to operate a telegraph line, and to fix and to collect tolls for the use of the same, is, to say the least, the most valuable part of the franchise conferred by Congress upon the railroad company, as a telegraph company. This right is alienated by a clear and unequivocal assignment or transfer from the railroad company to the plaintiff. Without discussing other features of the contracts, I am compelled to hold that this feature is alone sufficient to render them in excess of the corporate power of the company."

We now come to the important contract of July 1, 1881, between the Western Union Telegraph Company and the Union Pacific Railway Company. As that contract is too lengthy to be inserted at large in the body of this opinion, we have, in our statement of the case, given such of its provisions as appear to relate directly to the issues presented by the pleadings.

We have seen that the contract of July 1, 1881, was annulled by the original decree of the Circuit Court, but was upheld by the Circuit Court of Appeals, except as to the third and fourth paragraphs, which were adjudged by that court to be null and void to the extent that they secured and granted, or were intended to secure or grant, to the Western Union Telegraph Company any exclusive rights, privileges, or advantages whatsoever.

Much said in this opinion touching the agreements of 1866, 1869, and 1871, is applicable to that of 1881, and need not be here repeated. We have no difficulty in holding that the latter was invalid in the particulars named in the final decree of the Circuit Court of Appeals. But that agreement is illegal, not simply to the extent that it assumes to give to the Western Union Telegraph Company exclusive rights and advantages in respect of the use of the way of the railroad company for telegraph business; but it is also illegal because, in effect, it transfers to the Western Union Telegraph Company the telegraphic franchise granted it by the Government of the United States. The duty to maintain and operate a telegraph line between the points specified in the act of 1862 was committed by Congress to certain corporations which it named, and neither they, nor any corporation into which they were

merged, could, without the consent of Congress, invest a state corporation with exclusive telegraphic privileges on the line of the roads it then owned or thereafter acquired.   The United States was not bound to look to the Western Union Telegraph Company for the discharge of the duties the performance of which, in consideration of the aid received from the Government, the Union Pacific Railroad Company, and other named companies, undertook to discharge for the benefit of the United States and of the public.   No agreement with the telegraph company, to which the assent of the Government was not given, could take from the railroad company its right at any time to itself maintain and operate the telegraph line required by the act of 1862 for the use of the Government and of the public, nor impair the power of Congress to require the performance by the railroad company itself of the duties imposed by that act.   As to the object of the provisions of the agreement of 1881, the Circuit Court, speaking by Mr. Justice Brewer, properly said : " They mean that the telegraphic business and the telegraphic franchise, in the sense we have defined it, should be exercised by the Western Union Telegraph Company, and that no other company, railway or telegraph, should touch it.   The purpose was — a purpose disclosed by every section and line of the contract — that the public and commercial use of the telegraph wires should belong to the Western Union Company, leaving to the railroad company only so much of the telegraph wires as was necessary for its own business."   Again : " So it is that the lessons of experience support and establish the construction placed upon the contract of 1881, to the effect that the telegraphic franchise, as a franchise of independent, public, and commercial transportation, was intended to be and was transferred by the railway company to the Western Union Company, leaving only to the former so much use of telegraph wire as would facilitate and further its own railroad business."

That the purpose of the agreement of 1881 was to transfer to the Western Union Telegraph Company the telegraphic franchises granted by the United States, was asserted by that company in a bill filed by it (a copy of which is made a part

of the present record) to prevent the Union Pacific Railway Company from complying with the mandate of the act of August 7, 1888. In that bill it was claimed that the parties stipulated in the contract of 1881 that the telegraph company "might render to the Government and to the public such telegraph service as by the law of its creation it was bound to perform." And the telegraph company stated, in the same bill, that it had come about under that agreement, and through the growth of the railroad business, that the railroad company had "no wires on which it can do a general telegraph business, all those devoted to its railroad business being overburdened therewith." Again, in the same bill: "The said wires used by the defendant in the operation of its road are not equal to its necessities in that behalf, and it is impossible for it to do any business for the public or other companies on said wires without seriously interfering with and impeding the operation of its engines, cars, and trains, and if it undertake to do so it will be under the necessity of using your orator's five wires, or some of them. Upon your orator's said wires is carried on almost the entire transcontinental business of the Union; nor can your orator submit to any interference therewith by the defendant or any other party without seriously impeding and disarranging that business to its great loss and the public inconvenience." In addition to this, it may be stated that the telegraph superintendent of the railway company testified in this case that it would not be practicable to operate the wires used by the railroad company "for general commercial business without seriously interfering with the railroad business, and the railroad company's wires would be inadequate to carry any additional business." This inquiry need not be further extended, except to observe that there would be no occasion to make the Western Union Telegraph Company a defendant in this suit, and it would not have any standing in court to complain of the act of August 7, 1888, if it did not claim that the construction, or the maintenance and operation by the railway company, through its own employés, of a distinct telegraph line on the route of its road, for the use of the Government and of the public, was in violation of the contract it had made with the railroad company.

The fundamental question, therefore, is whether such a contract was permitted by the acts of Congress defining the obligations of railroad companies that had accepted the bounty of the Government. For the reasons we have given in the discussion of other parts of this case, we answer this question in the negative. Such a contract is not authorized by the fourth section of the Idaho act, or by the like section (19th) of the act of 1862. The "arrangements" authorized by those acts were not such as to admit of a contract that would disable the railroad company from entering upon the construction and maintenance itself of a telegraph line for the accommodation of the Government and of the public, or that would prevent the United States from requiring the railroad company to maintain and operate a telegraph line to be entirely controlled by itself, and which would be wholly independent of any telegraph line operated by corporations created under the laws of a State. And we may add what has been said in reference to the prior agreements of 1866, 1869, and 1871, namely, that no railroad company, operating a post road of the United States, over which interstate commerce is carried on, can, consistently with the act of July 24, 1866, bind itself, by agreement, to exclude from its roadway any telegraph company, incorporated under the laws of a State, which accepts the provisions of that act, and desires to use such roadway for its line in such manner as will not interfere with the ordinary travel thereon.

On behalf of the telegraph company it is contended that it was beyond the power of Congress to so legislate as "to impair the contracts, first, that between the United States and the several companies mentioned in the act of 1862; and, second, those between the railway company and this defendant." We perceive no ground on which this contention can properly rest. It has already been fully examined. As we have seen, Congress in the act of 1862 expressly reserved the power not only to alter, amend, or repeal that act, but to add to its provisions. To what has already been said as to the power of Congress, under this reserved power, we may add, that the object of such reservation is to enable the legislative

department to protect the public interests, and "to preserve to the State control over its contract with the corporators, which without that provision would be irrepealable and protected from any measure affecting its obligation." *Tomlinson v. Jessup,* 15 Wall. 454, 457, 458.

Another contention of the telegraph company is that for any failure or refusal by the railway company to comply with sections one and two of the act of August 7, 1888, the remedy of the United States is an action at law by mandamus, and that equity is without jurisdiction to enforce a compliance with those sections.

It cannot be doubted that the Government could lawfully proceed by mandamus against the railway company for the purpose simply of compelling it to perform any duty imposed by its charter or by statute. But that remedy would not afford the United States the full relief to which it is entitled. Here are agreements between the railway company and the telegraph company that are wholly inconsistent with the present claims of the Government. Until cancelled — because inconsistent with the act of 1888, and prejudicial to the rights of the Government and the public — by a decree to which the telegraph company is a party, those agreements constitute an obstacle in the way of the enforcement of that act, and the protection of those rights. In a mandamus proceeding by the Government against the railway company, the telegraph company could not properly be made a defendant, and no judgment in mandamus, as between the United States and the railway company, would conclude the rights of the telegraph company. The United States is certainly entitled to the interposition of equity for the cancellation of the agreements under which the telegraph company asserts rights inconsistent with the act of 1862 and the acts amendatory thereof, as well as with the act of 1888. Jurisdiction in equity being acquired for that purpose, the court, in order to avoid a multiplicity of suits, can proceed to a decree that will settle all matters in dispute between the United States, the railway company, and the telegraph company which relate to the general subject of telegraphic communication between the

points named by Congress. Consequently a decree cancelling the agreements of 1866, 1869, 1871, and 1881, by reason of their being in the way of the full performance by the railway company of the duties imposed by the act of 1888, may also require the railway company to obey the directions of Congress as given in the last named act.

Indeed, in a proceeding by mandamus instituted against the railway company alone, it might be objected that a court of competent jurisdiction, in a suit brought by the telegraph company against the railroad company, had enjoined the latter, as between it and the telegraph company, from disregarding the agreement of 1881. *Atlantic & Pacific Tel. Co.* v. *Union Pacific Railway*, 1 McCrary, 541; *Western Union Telegraph Co.* v. *Union Pacific Railway*, 3 Fed. Rep. 423; *Same* v. *Same*, 3 Fed. Rep. 721. It is true that the United States, with leave of court, might have intervened in that suit. But it was not bound to do so. It was entitled to institute its own suit, and bring before the court both companies, to the end that its rights might be declared and enforced by a comprehensive decree against both defendants.

In *Boyce* v. *Grundy*, 3 Pet. 210, 215, this court said: "It is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." The circumstances of each case must determine the application of the rule. *Watson* v. *Sutherland*, 5 Wall. 74, 79. In *Oelrichs* v. *Spain*, 15 Wall. 211, 228, an objection was raised that the remedy at law was ample. The court, observing that the remedy at law was not as effectual as in equity, said, among other things, that a "direct proceeding in equity will save time, expense, and a multiplicity of suits, and settle finally the rights of all concerned in one litigation." The final order in a proceeding by mandamus against the railway company would not conclude the rights of the telegraph company. Nor would a suit in equity by the telegraph company against the railway company conclude the rights of the United States. But a suit in equity by the United States against both companies for the purpose of an-

nulling the agreements under which the telegraph company claims rights adverse to the United States, can embrace all the matters in controversy and authorize a comprehensive decree that will terminate all disputes among the parties as to such matters. *Coosaw Mining Co.* v. *South Carolina*, 144 U. S. 550, 567.

These principles are abundantly sustained by the authorities. In 1 Pomeroy's Equity Jurisprudence, § 181, many adjudged cases are cited in support of the proposition that " if the controversy contains any equitable feature or requires any purely equitable relief which would belong to the exclusive jurisdiction, or involves any matter pertaining to the concurrent jurisdiction, by means of which a court of equity would acquire, as it were, a partial cognizance of it, the court may go on to a complete adjudication, and may thus establish purely legal rights and grant legal remedies which would otherwise be beyond the scope of its authority." This principle was applied in *Peck* v. *School Dist. &c.*, 21 Wisconsin, 516, 523. That was a suit to set aside a contract made by the officers of a municipality. The court held that the contract should be set aside, and the question arose whether the decree might not go farther and prevent the collection of the taxes assessed and levied for the purposes of the contract adjudged to be illegal. It was held that as the taxes were levied in order to carry the illegal contract into effect, their collection could be stayed as a proper subsidiary ground of relief, upon the principle that the jurisdiction of the court having once rightfully attached, it should be made effectual for all the purposes of complete relief. " The court," it was said, " will not annul the contract and at the same time permit the officers of the district to collect the taxes to be afterwards recovered back by a multiplicity of suits at law."

We are of opinion that the Circuit Court properly adjudged that equity had jurisdiction to give full relief in respect of all matters in issue between the United States and the defendant companies.

We perceive no substantial error in the decree passed by the Circuit Court. There are some minor provisions in each

of the contracts annulled by it which may not be regarded as in themselves beyond the power of the contracting parties, nor inconsistent either with the duties enjoined upon the railway company by the act of 1888 or with the rights of the United States. But they are of so little practical importance, and are so interwoven with, and so difficult to be separated from, the provisions found to be illegal and to stand in the way of the due execution of the act of Congress, that the Circuit Court properly adjudged that the contracts referred to should be set aside and annulled.

> *The decree of the Circuit Court of Appeals of January 29, 1894, is reversed and set aside, and the decree of the Circuit Court of October 11, 1892, is affirmed.*
>
> *It is further adjudged by this court that the Circuit Court make a supplemental decree, enlarging the period within which the defendants may make such arrangements, adjustments, and changes as shall become necessary by reason of the annulling of the contracts of October 1, 1866, September 1, 1869, December 14, 1871, and July 1, 1881, and to carry out the provisions of the final decree of that court. Reversed.*

MR. JUSTICE BREWER took no part in the hearing or decision of this case on the present appeal.