# UNITED STATES v. WESTERN UNION TELEGRAPH COMPANY AND UNION PACIFIC RAILWAY COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 19. Argued December 18, 1894. — Decided November 18, 1895.

Although the United States was entitled to retain and apply, as directed by Congress, all sums due from the Government, on account of the use by the Telegraph Company, for public business, of the telegraph line con-

structed by the Union Pacific Railway Company, the entire absence of proof as to the extent to which that line was, in fact, so used, renders it impossible to ascertain the amount improperly paid to, and without right retained by, the Telegraph Company, and subsequently divided between it and the Railroad Company.

THE case is stated in the opinion.

*Mr. Solicitor General Maxwell* for plaintiff in error.

*Mr. Rush Taggart* for defendants in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought by the United States to recover from the defendants in error the sum of $12,495.62, which amount, it is alleged, was paid to the Western Union Telegraph Company on account of telegraph messages transmitted for the Government, after July 1, 1881, over telegraph lines operated by that company on and over the route of the Union Pacific Railway, and was wrongfully divided between the two defendants in disregard of the rights of the United States.

The general ground upon which the Government rests this claim is that the sums paid by it on account of such messages were set apart for specific purposes by the acts of Congress under which the Union Pacific Railroad Company, the predecessor of the Union Pacific Railway Company, received the aid of the United States for the construction and maintenance of its railroad and telegraph lines.

Pursuant to the direction of the Circuit Court a verdict was returned for the defendants, and judgment was rendered in their favor.

The relations between the United States and the defendant company are fully shown in the opinion just rendered in the case of the *United States* v. *Union Pacific Railway Company, et al.*, 160 U. S. 1. In order, however, that the issue in the present case may be readily understood without frequently recurring to that opinion, it is necessary to restate some of the facts disclosed in the former case.

The Union Pacific Railroad Company was incorporated by the act of Congress of July 1, 1862, passed to aid in the con-

struction of a railroad and telegraph line between the Missouri River and the Pacific Ocean, and to secure to the Government the use of the same for postal, military, and other purposes. 12 Stat. 489, c. 120.

That act granted to the company a right of way through the public domain for the construction of a railroad and telegraph, and, in aid of such construction granted also every alternate odd-numbered section of public land, not mineral, to the amount of five alternate sections per mile, within the limits of ten miles on each side of the road, and which had not been sold, reserved, or otherwise disposed of by the United States, and to which a preëmption or homestead claim had not attached. §§ 1, 2, 3, 4.

For the purposes mentioned, the Secretary of the Treasury was required, upon the written certificate, by commissioners appointed by the President, of the completion and equipment of each forty consecutive miles of railroad and telegraph, as prescribed by the act, to issue to the company bonds of the United States for a named amount. And to secure the repayment to the United States of any bonds so issued and delivered, with the interest thereon paid by the United States, such issue and delivery were declared to constitute, *ipso facto*, a first mortgage on the whole line of the railroad and telegraph, together with the rolling stock, fixtures, and property of every kind belonging to the company. § 5.

By the sixth section of that act it was provided that "the grants aforesaid are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit despatches over said telegraph line, and transport mails, troops, and munitions of war, supplies, and public stores upon said railroad for the Government, whenever required to do so by any Department thereof, and that the Government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service); and all compensation for services rendered for the Government shall be applied to the payment

of said bonds and interest until the whole amount is fully paid. Said company may also pay the United States, wholly or in part, in the same or other bonds, Treasury notes, or other evidences of debt against the United States, to be allowed at par; and after said road is completed, until said bonds and interest are paid, at least five per centum of the net earnings of said road shall also be annually applied to the payment thereof."

The nineteenth section was in these words : " The several railroad companies herein named are authorized to enter into an arrangement with the Pacific Telegraph Company, the Overland Telegraph Company, and the California State Telegraph Company, so that the present line of telegraph between the Missouri River and San Francisco may be moved upon or along the line of said railroad and branches as fast as said roads and branches are built ; and if said arrangement be entered into, and the transfer of said telegraph line be made in accordance therewith to the line of said railroad and branches, such transfer shall, for all purposes of this act, be held and considered a fulfilment on the part of said railroad companies of the provisions of this act in regard to the construction of said line of telegraph. And, in case of disagreement, said telegraph companies are authorized to remove their line of telegraph along and upon the line of railroad herein contemplated without prejudice to the rights of said railroad companies named herein."

This act also provided that the better to accomplish its object, " namely, to promote the public interest and welfare by the construction of said railroad and telegraph line, and keeping the same in working order, and to secure to the Government at all times (but particularly in time of war) the use and benefits of the same for postal, military, and other purposes, Congress may, at any time, having due regard for the rights of said companies named herein, add to, alter, amend, or repeal this act." § 18.

This act was amended by an act approved July 2, 1864. 13 Stat. 356, c. 216.

The latter act contained additional grants of lands and

bonds, and by its fifth section provided that only " one-half " of the compensation for services rendered for the Government by the companies named in the act " shall be required to be applied to the payment of the bonds issued by the Government in aid of the construction of said roads." By the fifteenth section of that act the several companies authorized to construct the roads named were required " to operate and use said roads and telegraph for all purposes of communication, travel, and transportation, so far as the public and the Government are concerned, as one continuous line ; and, in such operation and use, to afford and secure to each equal advantages and facilities as to rates, time, and transportation, without any discrimination of any kind in favor of the road or business of any or either of said companies, or adverse to the road or business of any or either of the others," etc.   13 Stat. 356, 358, 362.

By an act approved May 7, 1878, known as the Thurman Act, 20 Stat. 56, c. 96, § 2, it was provided that "the whole amount of compensation which may, from time to time, be due to said several railroad companies respectively for services rendered for the Government shall be retained by the United States, one-half thereof to be presently applied to the liquidation of the interest paid and to be paid by the United States upon the bonds so issued by it as aforesaid, to each of said corporations severally, and the other half thereof to be turned into the sinking fund hereinafter provided, for the uses therein mentioned." The same act made it the duty of the Attorney General of the United States to enforce, by proper proceeding, against the said several railroad companies, respectively or jointly, or against either of them, and others, "all the rights of the United States under this act and under the acts hereinbefore mentioned, and under any other act of Congress or right of the United States; and in any suit or proceeding already commenced, or that may be hereafter commenced, against any of said companies, either alone or with other parties, in respect of matters arising under this act, or under the acts or rights hereinbefore mentioned or referred to, it shall be the duty of the court to determine the very right of the matter without regard to matters of form,

joinder of parties, multifariousness, or other matters not affecting the substantial rights and duties arising out of the matters and acts hereinbefore stated and referred to." § 10.

In 1865 the Union Pacific Railroad Company began to construct its road, and, in 1869, completed its main line from Omaha to Ogden. It also constructed a separate telegraph line on the *north* side of its right of way from a point at or near Omaha to Ogden.

The Leavenworth, Pawnee and Western Railway Company, a corporation of Kansas, referred to in the ninth section of the act of 1862, and in the twelfth section of the act of 1864, c. 216 — and which at the date of the latter act was known as the Union Pacific Railway Company, Eastern Division, 12 Stat. 493, 13 Stat. 361, began, in 1865, to construct, and, in 1870, completed, a railroad from Kansas City to Denver, connecting at the latter point under the authority of an act of Congress, 15 Stat. 324, c. 127, with the Denver Pacific Railroad and Telegraph Company, a corporation of Colorado, whose road extended from Denver to Cheyenne.

In 1880, these three companies — the Union Pacific Railway Company, Eastern Division, having previously changed its name to that of Kansas Pacific Railway Company — consolidated their lines, property, and franchises, and became the Union Pacific Railway Company, a defendant in this action.

As operated, at the time this action was brought, the Union Pacific Railway extended from a point at or near Council Bluffs to Ogden, and from Kansas City, by the way of Denver, to Cheyenne.

The entire line from a point at or near Omaha to Ogden, and the line from Kansas City to Boaz, between Kansas City and Denver, was aided by the United States by grants of lands and by bonds; the line from Boaz to Denver, and from Denver to Cheyenne, by grants of land alone.

The United States has never been reimbursed in full for the interest paid on these bonds, and if in this action the Government should recover the whole sum claimed by it, a large deficit would still remain over and above all payments made or credits given.

On the 16th day of June, 1860, Congress passed an act to "facilitate communication between the Atlantic and Pacific States by electric telegraph." 12 Stat. 41, c. 137.

At the date of that act, the Western Union Telegraph Company owned or operated lines extending eastward and southward from St. Joseph to Washington, New Orleans, New York, and other principal cities of the United States.

Under the act of 1860, the Pacific Telegraph Company and the California State Telegraph Company began in 1861 to construct, and prior to 1863 had completed and put in operation, a telegraph line from St. Joseph, Missouri, by way of Omaha and Salt Lake City, to San Francisco, upon substantially the route afterwards adopted by the Union Pacific Railroad Company for its road between Omaha and Ogden.

Proceeding under the nineteenth section of the act of July 1, 1862, above quoted, the Pacific Telegraph Company and the California State Telegraph Company transferred their lines from their prior location and reconstructed them upon the *south* side of the right of way of the Union Pacific Railroad Company, as rapidly as the latter constructed its road between Omaha and Ogden, and those companies or the Western Union Telegraph Company have ever since operated and maintained those lines. But this transfer was made without any arrangement with the railroad company, but under that provision of the act of 1862 declaring that, in case of disagreement, the telegraph companies "are authorized to remove their line of telegraph along and upon the line" of the railroad, without prejudice to the rights of the railroad companies named in that act. § 19.

In 1864 the Pacific Telegraph Company was consolidated with, and in 1867 the California State Telegraph Company was leased to, the Western Union Telegraph Company.

On the 1st day of September, 1869, the Union Pacific Railroad Company leased its line of telegraph to the Atlantic and Pacific Telegraph Company by an agreement of that date, which was supplemented by an agreement entered into on the 20th day of December, 1871. Under those agreements, which were examined in the case of *United States* v. *Union Pacific*

*Railway Company et al.*, just decided, the Atlantic and Pacific Telegraph Company operated the railroad telegraph lines until about February 1, 1881, when it was merged into the Western Union Telegraph Company by consolidation.

Prior to July 2, 1864, the United States Telegraph Company began the construction of a telegraph line from Wyandotte, Kansas, westward, and was constructing it at the time the Leavenworth, Pawnee and Western Railroad Company began to build its road; and, under the act of July 2, 1864, known as the Idaho act, entitled "An act for increased facilities for telegraph communication between the Atlantic and Pacific States and the Territory of Idaho," 13 Stat. 373, c. 220, it removed its constructed line and located the same upon the right of way of the Leavenworth, Pawnee and Western Railroad Company, and continued to build and operate its line as the construction of that road progressed.

This Idaho act authorized the several railroad companies named in the act of July 1, 1862, to enter into arrangements with the United States Telegraph Company, so that the line of telegraph between the Missouri River and San Francisco could be made upon and along the line of said railroad and branches as fast as that road and branches were built. If such arrangements were entered into, and the transfer of the telegraph line was made, in accordance therewith, to the line of the railroads and branches, such transfer should, for all purposes of the act referred to, be held and considered a fulfilment on the part of the railroad companies of the provisions of the act in regard to the construction of a telegraph line; and in case of disagreement the telegraph company was authorized to remove its line of telegraph along and upon the line of railroad therein contemplated, without prejudice to the rights of the railroad companies. § 4.

On the 27th day of February, 1866, the United States Telegraph Company transferred its telegraph lines, and the right to extend the same, to the Western Union Telegraph Company, and the latter built a telegraph line along the railroad last named, as fast as that road was constructed, and on October 1, 1866, the latter company, and the railroad company

under the name of the Union Pacific Railway Company, Eastern Division, entered into an agreement pursuant to which that telegraph line was completed to Denver.

The Leavenworth, Pawnee and Western Railroad Company constructed no line of telegraph along its road, but received the compensation prescribed by the several acts of Congress for the full performance of the conditions of those acts, namely, land and bonds for the road from Kansas City to Boaz, and lands for the road from Boaz to Denver.

In Title LXV of the Revised Statutes will be found, substantially, all the provisions of the act of July 24, 1866, entitled "An act to aid in the construction of telegraph lines, and to secure to the Government the use of the same for postal, military, and other purposes," 14 Stat. 221, c. 230, as well as some of the provisions of other acts relating to the same general subject. Those provisions are as follows:

"§ 5263. Any telegraph company now organized, or which may hereafter be organized, under the laws of any State, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States, which have been or may hereafter be declared such by law, and over, under, or across the navigable streams or waters of the United States; but such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads.

"§ 5264. Any telegraph company organized under the laws of any State shall have the right to take and use from the public lands through which its lines of telegraph may pass, the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance, and operation of its lines of telegraph, and may preëmpt and use such portion of the unoccupied public lands subject to preëmption through which their lines of telegraph may be located as may be necessary for their stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other."

Section 5265 forbids the transfer by any company to any other corporation, association, or person of the rights granted by the act of July 24, 1866, or by the above title.

"§ 5266. Telegrams between the several Departments of the Government and their officers and agents, in their transmission over the lines of any telegraph company to which has been given the right of way, timber, or station lands from the public domain shall have priority over all other business, at such rates as the Postmaster General shall annually fix. And no part of any appropriation for the several Departments of the Government shall be paid to any company which neglects or refuses to transmit such telegrams in accordance with the provisions of this section.

"§ 5267. The United States may, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects of any or all companies acting under the provisions of the act of July 24, 1866, or under this title, at an appraised value, to be ascertained by five competent, disinterested persons, two of whom shall be selected by the Postmaster General of the United States, two by the company interested, and one by the four so previously selected."

Section 5268 provides that " before any telegraph company shall exercise any of the powers or privileges conferred by law such company shall file their written acceptance with the Postmaster General of the restrictions and obligations required by law."

On the 7th of June, 1867, the Western Union Telegraph Company formally accepted the provisions of the act of July 24, 1866, and since about January 1, 1873, the compensation it was entitled to receive for sending messages for the Government has been fixed by the Postmaster General.

The Union Pacific Railway Company never accepted the provisions of the act of July 24, 1866, as to its telegraph line.

On the 1st day of July, 1881, the Western Union Telegraph Company and the Union Pacific Railway Company entered into an agreement, under which the former operated all the telegraph lines named in it, and the provisions of which have been, and at the date this action was brought were being, carried out by both parties.

The preamble of that agreement recites that it was made "for the purpose of providing telegraphic facilities for the parties hereto, and of maintaining and operating the lines of telegraph along the railway company's railroads in the most economical manner in the interest of both parties and for the purpose of fulfilling the obligations of the railway company to the Government of the United States and the public in respect to the telegraphic service required by the act of Congress of July 1, 1862, and the amendments thereto."

All the telegraph lines and wires covered by the agreement, belonging to or used by either party, were, for the purposes of the contract, to "form part of the general system of the telegraph company;" and the railway company was to be protected by the telegraph company from the payment of all taxes levied and assessed upon the telegraph property belonging to either party.

This agreement, by its terms, extended to all railroads and branches or extensions, then or thereafter owned or controlled by the railroad company, except railroads that might be subsequently acquired, on which the telegraph company already had a line in operation; and to such roads the agreement was not to apply, except by mutual consent of the parties.

The third paragraph of this agreement provided that "the railway company, so far as it legally may, hereby grants and agrees to assure to the telegraph company the exclusive right of way on, along, upon and under the line, lands and bridges of the railway company and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires, or either of them, or underground or other system of communication for commercial or public uses or business, with the right to put up from time to time or cause to be put up or constructed under the provisions of this agreement, such additional wires on its own or the railway company's poles or such additional lines of poles and wires, or either, as well on its bridges as on its right of way, or to construct such underground lines as the telegraph company may deem expedient, doing as little damage and causing as little inconvenience to the railway company as is

practicable, and the railway company will not transport men or material for the construction or operation of a line of poles and wire or wires or underground or other system of communication in competition with the lines of the telegraph company, party hereto, except at and for the railway company's regular local rates, nor will it furnish for any competing line any facilities or assistance that it may lawfully withhold, nor stop its trains, nor distribute material therefor at any other than regular stations."

By article four of the agreement it was provided that the employés of the railway company "shall transmit over the lines owned, controlled, or operated by the parties hereto, all commercial telegraph business offered at the railway company's offices, and shall account to the telegraph company exclusively for all of such business and the receipts thereon, as provided herein;" that "the telegraph company shall have the exclusive right to the occupancy of the railway company's depots or station-houses for commercial or public telegraph purposes as against any other telegraph company;" and "that if any person or party, or any officer of the Government, tender a message for transmission over the railway telegraph lines between Council Bluffs and Ogden at any railway telegraph station between those points and require that the service be rendered by the railway company, the operator to whom the same is tendered shall receive and forward the same accordingly, at rates to be fixed by the railway company, to the point of destination if not beyond its own lines. . . . *Provided, however*, That the local receipts of the railway company on such message shall be divided between the parties hereto in the same manner and subject to the same conditions as provided in the tenth clause of this agreement." The tenth clause provided that "at all telegraph stations of the railway company its employés shall receive, transmit, and deliver such commercial or public messages as may be offered, and shall render to the telegraph company monthly statements of such business, and full accounts of all receipts therefrom, and the railway company shall cause all of such receipts to be paid over to the telegraph company monthly;" and the telegraph

company agreed " to return to the railway company monthly one-half of the cash receipts at telegraph stations maintained and operated by and at the expense of the railway company." The telegraph company agreed to furnish at its own expense all blanks and stationery for commercial or public telegraph business, and all instruments, main and local batteries and battery material for the operation of its own and the railway company's wires and offices. It is also covenanted to save the railway company harmless and indemnify it against loss or damage from neglect or failure in the transmission or delivery of messages " for any person doing business with said telegraph company, or on account of any other public or commercial telegraph business " for which the railway company was to account.

No record was kept of business done under this agreement of 1881, and the parties have stipulated, that " it is now impossible to prove over what particular wire or wires the messages set out in the plaintiff's bill of particulars were actually transmitted, but a part were sent over what, prior to 1881, were the wires of the railroad company, and the balance over the wires owned by the telegraph company."

Since the contract of 1881, the telegraph company and the railway company have not maintained distinct offices or employed different sets of telegraph operators except at some of the larger towns and cities, where the Western Union Telegraph Company has, in addition, established separate offices for the transaction of commercial business away from the line of the railway, but the offices have been in common and the same set of operators have done the work required by both the telegraph company and the railway company.

In the agreed statement of facts. it appears that " the amount of messages set out in the plaintiff's bill of particulars correctly states the date of each message therein set forth; the sender of the same, and from what point to what point the same was transmitted by the Western Union Telegraph Company; the amount collected by the Western Union Telegraph Company for the transmission of the same; the proportionate amount of the whole sum thus paid to the Western Union

Telegraph Company which was for the bonded portion of the telegraph lines along the railways of the Union Pacific Railway Company, such sum being such proportionate amount of the whole amount paid as the distance along the bonded portion of the telegraph along said line or lines of railway bears to the whole distance the message was transmitted from the point of origin to the point of destination; that the compensation for each of the messages was computed and paid for as one entire service and at the then ruling rate for such entire distance fixed by the Postmaster General of the United States, in accordance with section 5266 of the Revised Statutes of the United States; all of said messages were delivered to the Western Union Telegraph Company by the agent or officer of the Government sending the same, written upon the Western Union Telegraph Company's blanks, and directed to the receiver of such message at the point of destination and without any direction to transmit the same over the bonded portion of the line of telegraph of the Union Pacific Railway Company for the whole or any part of the distance, but it was known to the Western Union Telegraph Company, from the character of the said messages, that they were from one officer or agent of the Government to another. That at all the times the said messages were thus transmitted by the Western Union Telegraph Company at the rates annually fixed by the Postmaster General of the United States, the ordinary rates, known as commercial rates, charged to other persons for transmitting like messages for the same distances were very much in excess of the rates fixed by the Postmaster General; that the ordinary or commercial rate upon the bonded portions of the lines of telegraph situated along the lines of railway of the Union Pacific Railway Company was likewise very much in excess of the rates fixed by the Postmaster General of the United States during the period covered by the account in this action. That as to a large number of messages included in said bill of particulars and known as Signal Service reports, the same were transmitted under special arrangement and differently from other classes of messages, upon what were known as 'circuits,' with 'drops' at all places receiving the said Signal Service reports. The

method of doing said business was as follows: As many places as the Chief Signal Service Officer desired should receive the said Signal Service report were connected upon one continuous line of telegraph called a 'circuit,' and the said reports were then sent over this wire, and at each point where said reports were received an operator took the said reports; each of said points thus receiving the report being called a 'drop,' and all of said points receiving the said reports at the same time; that by reason of this method of sending reports, a specially low rate was made therefor, the said rate being fixed by the Postmaster General in the circulars issued annually, and upon the basis of amount of matter and number of drops, and extent of circuits. That the circuits for the transmission of said Signal Service reports were made up between the points named in the account in this action, and included intermediate points or drops in each case; that the amount sought to be recovered in this action is such proportionate amount of the whole amount paid as the distance along the bonded portion of the telegraph lines upon the said line or lines of railway bears to the whole distance over which such messages or reports were sent."

Such is the case made by the record now before the court.

It is clear, under the acts of 1862, 1864, and 1878, that the Government was entitled to retain, and to apply as directed by Congress, all sums due on account of services rendered in its behalf, by any railroad company named in those acts, that had received the aid of the United States in the construction of its railroad and telegraph lines. All such sums were set apart by Congress for the payment of the principal and interest of any bonds delivered by the United States to such company. The Government could, therefore, have retained and applied, as in the acts of Congress required, all sums due from it on account of messages sent or received by it over the telegraph line *constructed by the Union Pacific Railroad Company. Sinking Fund cases,* 99 U. S. 700. No agreement between that company and the Western Union Telegraph Company, transferring to the latter the control of the tele-

graph line constructed by the railroad company, could affect the rights of the United States.

If it distinctly appeared that the amount sued for was only the aggregate of sums originally due from the United States, on account of public messages passing over the telegraph lines constructed by the Union Pacific Railroad Company, we should have no difficulty in sustaining the present claim of the Government. But no such state of case is presented by the record. It does not even appear that the Government, prior to the period covering the account in suit, requested the telegraph company to so keep its books as to show what messages sent or received on public business were transmitted over the telegraph line constructed by the railroad company on its route. Nor does it appear that any such account was kept by the Government.

It is agreed to be now impossible to show over what particular wire or wires — whether those belonging to the Western Union Telegraph Company or those belonging to the Union Pacific Railway Company — the messages set out in the Government's bill of particulars were, in fact, transmitted. Nothing more definite appears than that "a part" — how much cannot be now known — were sent over the wires originally established by the railroad company, and "the balance" — how much cannot be shown — over the wires owned by the telegraph company.

It is because of the impossibility of now distinguishing between these two classes of messages, that this action proceeds, and can only proceed, upon the theory that the length which the telegraph line, constructed *by the railroad company*, bears to the entire distance, in whatever part of the United States, from the point of origin of a telegraph message to the point of its destination, measures the proportion which might have been rightfully retained by the Government of the entire sum earned by the telegraph company for transmitting and delivering such messages.

According to this theory, the presumption must be indulged that every message delivered to the telegraph company for transmission, and which passed over the whole or some part

of the general route of the Union Pacific Railway, passed over the telegraph line constructed on the north side of that route by the railroad company, but operated by the telegraph company, rather than over the line, on the south side of that route, owned by the telegraph company. No such presumption can be justified upon any principle of right or justice.

The telegraph company had a line of its own on the right of way of the railway company, with the consent of the United States. It accepted the provisions of the act of Congress giving the Postmaster General authority to fix the rates to be charged for any business transacted for the Government. But it neither expressly nor impliedly agreed that, when no directions in the matter were given by the representative of the Government, it would transmit all messages, on behalf of the Government, from or to points on either side of the route of the Union Pacific Railway, over the telegraph line constructed by the railroad company, rather than over the line owned by itself. In the absence of such directions, the telegraph company was at liberty to send such messages over its own line at the rates established by the Postmaster General. If it did so, the Government was probably benefited rather than injured; for the rates fixed by the Postmaster General were less than the ordinary rates, known as commercial rates, charged against private persons, and which the railway company, by its charter, was entitled to charge for public messages sent over its telegraph line. If, in the absence of any direction not to do so, the telegraph company actually used, for the purpose of transmitting a public message, the line constructed by the railroad company, there can be no doubt that the sum due therefor could be retained by the United States and applied as indicated in the act of 1878; for the telegraph company, notwithstanding the agreement of July 1, 1881, would be bound to take notice of the fact that that telegraph line was constructed with the aid of the Government, and that *its* earnings on account of public business were dedicated by Congress to specific purposes.

It results that, although the United States was entitled to retain and apply, as directed by Congress, all sums due from

the Government, on account of the use by the telegraph company, for public business, of the telegraph line constructed by the railroad company, the entire absence of proof as to the extent to which that line was, in fact, so used, renders it impossible to ascertain the amount improperly paid to, and without right retained by, the telegraph company, and subsequently divided between it and the railroad company. Upon this ground, we adjudge that the court below did not err in directing a verdict for the defendants.

The judgment is

*Affirmed.*