## PROBABLE LOSS NOT A DEFENSE FOR DISREGARD OF FRANCHISE CONDITIONS.

Common Pleas Court of Hamilton County.

THE CITY OF CINCINNATI, BY ALFRED BETTMAN, ITS SOLICITOR, v. THE INTERURBAN RAILWAY & TERMINAL CO. ET AL.

Decided, April 25, 1913.

*Public Utilities—Conditions Embodied in Franchise Can Not be Ignored Through Fear of Financial Loss—Where Misrepresentation or Fraud Are Not Charged Against the Municipality in Procuring the Franchise.*

In an action to compel a public service corporation to abide by a certain condition of its franchise, a defense is not stated by the averment that the company can not carry out the condition named without serious financial loss and possible bankruptcy.

*Alfred Bettman,* City Solicitor, for motion.
*Dinsmore & Shohl,* contra.

NIPPERT, J.

The plaintiff in this case, the city of Cincinnati, through its solicitor, has brought this action for the purpose of enjoining the defendants from charging passengers on their cars any rate of fare in excess of that provided in the ordinance passed by the council of the village of Pleasant Ridge on the 19th day of November, 1901, by which ordinance a certain grant and franchise was created, which provided "that should the village of Pleasant Ridge be annexed to the city of Cincinnati, the rate of fare charged for a ride in either direction between any point in said village and the. Cincinnati terminus shall not exceed five cents and transfers."

To this petition of the city of Cincinnati, the Interurban Railway & Terminal Company filed an answer, in which it sets up, among a number of other defenses, the following:

"Defendant further says that the said provision is unreasonable and that a fare of five cents from the corporation limits of the village of Pleasant Ridge to the Cincinnati terminus, three cents of which this defendant is required to pay to the Cincinnati Traction Company, as hereinbefore alleged, will not be sufficient to produce an income to pay the operating expenses of this defendant company and will destroy its existence and prevent it from operating any cars whatsoever on said line."

Solicitor Bettman, for the city of Cincinnati, now moves that the aforesaid paragraph be stricken from the answer of the defendant as irrelevant.

It is claimed by the attorneys for the defendant, the Interurban Railway & Terminal Company, in support of the above mentioned· defense, that the net fare which the defendant company receives from each passenger carried to or from the village of Pleasant Ridge to or from Cincinnati (which city has now annexed Pleasant Ridge) is only two cents, which, on the face of it seems insufficient to produce an income to pay the operating expenses of the interurban company, and if insisted upon might eventually destroy the very existence of said company and prevent it from operating any cars whatsoever on said line.

I believe it has been stated in the argument that the distance from Pleasant Ridge to the Cincinnati terminus is about eight miles. This means that for each through passenger the interurban company receives the sum of one-fourth of a cent per mile, or two cents for the eight miles, the difference between two cents and five cents going to the Cincinnati Traction Company in consideration of the latter company hauling the cars of the interurban company over city tracks.

The claim made by the Interurban Railway & Terminal Company that its very existence will be destroyed and that it will be prevented from operating any cars whatsoever may undoubtedly be based upon facts which the defendant may be able to easily prove to the satisfaction of the plaintiff or any one else interested in the defendant company, and the ultimate effect of the action brought by the city might result, not in the enforcement of a five-cent fare, but in the discontinuance of the defendant's transportation facilities, to the great detriment and inconvenience of the people of Pleasant Ridge. While this may all be true, and assuming it, for the purpose of argument, to be the logical though disastrous result to the defendant company if said franchise conditions should be enforced by the city of Cincinnati, the court can not consider at this time the possible result, nor its effect upon one of the contracting parties, for they are both presumed to have known the full extent, purpose and obligation imposed upon them by the terms of said grant and franchise; and for the company to come now into this court and set up as one of its defenses the fact that such enforcement would mean practically a discontinuance of its operation seems to imply that when it made its contract with the village of Pleasant Ridge, it was made with certain mental reservations to the effect that if the time should ever come that the village of Pleasant Ridge would be annexed to the city of Cincinnati some ways or means could be found to abrogate an unprofitable contract. In other words, the interurban company was willing to concede anything for the purpose of securing a franchise and leave to the future to take care of the difficulties which might arise by reason of the stringency of the

terms of said franchise. ''Sufficient unto the day is the evil thereof,'' seems to have been the maxim of the grantee of the Pleasant Ridge franchise.

In the case of *State of Nebraska* v. *Sioux City & Pacific Railroad Co.,* 7 Neb., 357, the court held that the railroad company in accepting a grant from the state thereby enters into a contract with the state to build and maintain its line and to operate the same, and the state may enforce the contract by mandamus or other appropriate proceedings, and such a franchise or grant can only be impeached for fraud or set aside for other sufficient cause but can not be assailed collaterally.

In the case of *United States* v. *Union Pacific Ry. Co. et al,* 160 U. S., 1, the United States Supreme Court upheld the principle that an explicit charter provision requiring operation of a public system will be enforced.

A similar question was raised in the case of *People* v. *Plainfield Avenue Gravel Road Company,* 105 Mich., 9. In this case a gravel road company purchased the property and franchises of a certain bridge company. Some years after the purchase of the bridge company's property, the bridge was washed away by a freshet and the company upon being notified by the highway commissioner to rebuild the bridge abandoned that portion of the highway, assigning as a reason for such action on its part its inability to raise the requisite amount of money necessary to rebuild the bridge. The court, in its opinion, affirming a decree in favor of the people, held:

''*a.* That the inability of the defendant to raise money with which to rebuild the bridge is no answer to the bill.

''*b.* That the bridge constituted a part of the defendant's road and it is of no consequence whether it was destroyed with or without fault on its part.''

The court in a strong opinion stated that the financial condition of the company was immaterial. The inability of the company to raise funds to make the necessary repairs might be a good defense in a proceeding instituted to compel such repairs (see *City of Benton Harbor* v. *Railway Co.,* 102 Mich., 386), but it is no answer in a proceeding on the part of the public to forfeit

its charter.    Inability to perform its functions, no matter what the reason, is one of the potent grounds for forfeiture.    The court further held:

"The bridge constituted a part of the defendant's road and it is of no consequence whether it was destroyed with or without its fault.    If the right of abandonment did not exist, the duty to repair is imperative.    It may be a hardship but it was a part of its contract to make all repairs no matter what the cause which made it necessary.    *Meriwether* v. *Lowndes Co.*, 89 Ala., 362.    *   *   *    The public is not concerned in matters pertaining to the increase or decrease of the capital stock.    As already shown they can not appropriate to their use or benefit any portion of an existing public highway without the assent of the proper authorities.    Having obtained the control of such highway by such assent and having agreed to keep it in repair, it would clearly be a most unwise policy to permit the company at its own convenience, for its own benefit and at its own choice, to abandon a portion of the highway the moment it has become out of repair.    Such power must be shown to be clearly conferred by some provision of the law."

It appears that the Michigan case is in point with the case at bar.    The Interurban Railway & Terminal Company has received a franchise from the village of Pleasant Ridge.    The terms of its franchise provided a five-cent fare to Cincinnati upon the annexation of the village.    The defendant admitted in its answer that it is continuing in the operation of this franchise and we fail to find any authorities which controvert the well established principle that as long as a public service corporation operates under a particular franchise, it is bound to perform the terms and conditions of that particular franchise.

But counsel for the terminal company alleges that it would not only be unprofitable to carry passengers for two cents from the corporate limits of Pleasant Ridge to the Cincinnati terminus, but further asserts that the very existence of the company will be destroyed.

I believe that their remedy when that danger is actually threatening lies with the city itself reforming the franchise, but at this time we are only concerned as to whether or not such a defense is a proper one in this action.

It must be understood that the railway company is still operating its system, has a full equipment of rolling stock, tracks, etc., is a running concern, and has not abandoned any of its corporate franchises. This is not an action in mandamus to compel a bankrupt and crippled concern to resume its service such as is referred to in the case of *State of Kansas* v. *The Dodge City Railway Company*, 53 Kansas, 329, but it is an action on part of the city to enjoin the defendant from charging passengers on their cars, contrary to its franchise, any rate of fare in excess of five cents between the terminals indicated.

That this obligation is co-existing with the life of the franchise can not be disputed. If the franchise has been accepted by the particular public service corporation, it is mandatory in its terms, and being voluntarily assumed at the outset, the company can not withdraw at its pleasure or change the terms thereof at its own sweet will.

In case of *Savannah Canal Co.* v. *Shuman*, 91 Ga., 400, the court said:

"So long as the corporation retains its franchise, it will not be allowed to urge as an excuse for failing to perform any duty required of it by its charter, that the same would be unprofitable. *It can not consistently keep the franchise and refuse to perform the duties incident thereto for the mere reason that such performance would be unremunerative.* If the rights, privileges and franchises granted by the charter are in connection with the corresponding duties imposed no longer desirable, the company should simply surrender the charter."

We do not mean to say that a corporation, engaged in the transportation of passengers, under a franchise granted to it by a municipality, may not abandon its property and quit business without being subject to mandatory proceedings to compel it to continue to carry it on, for the company may find it impossible to do so as intimated in defendant's answer. The rate of fare fixed by law may be too small to enable it to operate at a profit or without a substantial loss, or, it may conclude, without reason which the law would consider sufficient, that it will not continue. This question not being involved in this case, no

opinion need to be expressed, for, if it should come to that point, it must either comply with the terms of the franchise and reinstate its service, if it has abandoned it, or permit the city to grant the use of its streets to another corporation engaged in the transportation of passengers to and from the city for the benefit and convenience of the public. See *Fellows* v. *Los Angeles*, 151 Cal., 52, 64 and 65.

Coming now to the consideration of the Ohio decisions, we have the much quoted Zanesville case, in 47 Ohio State, 35, *Gas Co.* v. *Zanesville*, where the court held:

"Where it is the duty of a gas company to furnish gas to a city at the rates fixed by an ordinance of the city council, it may, if it refuse, be compelled by a mandatory injunction so to do, so long as it continues to exercise and enjoy its franchises as a gas company.

"A suit for this purpose may be brought by the city solicitor."

The court, in the Zanesville case, held that the gas company was certainly under an obligation to manufacture and sell gas to the city of Zanesville and its citizens when it accepted and exercised the franchises granted it by its charter and when by ordinance the city granted it the use of its streets and alleys for the purpose of distributing gas to its consumers. This was not a duty arising from "an office, trust or station," but an obligation created by contract, which it was under a legal duty and might be compelled to perform as any other contract under like circumstances.

In the case at bar there is no complaint that there was any fraud in the adoption of the ordinance and that therefore the ordinance should be held void, but, the company merely sets up as one of its defenses that it would be unprofitable to continue to operate its cars under the rate of fare established by the franchise and agreed to at that time by the company.

In case of *East Ohio Gas Company* v. *City of Akron*, 81 Ohio State, 33, the court in its opinion follows the decision of the Supreme Court in the Zanesville case, 47 Ohio State, 35, in affirming that so long as such company continues to exercise any of its franchises within the contracting municipality, it may

be compelled to exercise its franchise therein fairly and without discrimination.   The consent of the city for that purpose was granted by the ordinance, it was accepted by the gas company and as the company entered upon the performance of its duties by virtue of such a contract it can not withdraw therefrom or change the same except by consent of the city.   Such contracts will be construed strictly against the grantee and liberally in favor of the public.   If the company refuses to comply, it necessarily incurs the penalty of forfeiture of its franchise to serve the people of the city.   The company might, by reason of its insolvency, be forced to discontinue the public service, but as long as it maintains its operations under the franchise it must submit to its terms.

The motion of the city of Cincinnati to strike the respective paragraph from the answer of the defendant as irrelevant is therefore sustained.